IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

**FILED**

**FEB 1 2 1997**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
*EB Hutton Gr*

CHARLES L. CARTER,       )
                         )
     Plaintiffs          )
                         )
v.                       )
                         )
THREE SPRINGS RESIDENTIAL )
TREATMENT CENTER         )       CV NO. 95-HM-2325-NW
                         )
     Defendants          )

**ENTERED**

FEB 1 4 1997

## SUMMARY JUDGMENT
## MEMORANDUM OPINION

The above-entitled racial discrimination in employment civil
action [failure to promote] brought by Plaintiff Charles L. Carter,
a male Afro-American citizen now 63 years of age [born 4-17-33],
residing in Colbert County, Alabama against Defendant Three Springs
Residential Treatment Center, an Alabama for profit corporation,[1]
pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et
seq. ["Title VII"] and the Civil Rights Action of 1991, 42 U.S.C. §
1981(a), with jurisdiction predicated on 28 U.S.C. § 1331 [federal
question], which charges that the corporate Defendant in January,
1993 by and through its then **outgoing** PROGRAM DIRECTOR, Dr. Pam
Cook [a white female] and its then **outgoing** ADMINISTRATOR, Beverly
McLemore [a white female], both being top tier executives of the
Defendant's Three Springs Residential Treatment Center at Courtland,
Alabama [hereinafter "Courtland RTC"] and both being then in the

---

[1] Which at all times relevant to this civil controversy operated and now operates a number of long
term residential treatment facilities for psychologically troubled adolescents.

process of being promoted up the corporate ladder by the corporate Defendant, i.e., Dr. Pam Cook from the position of Program Director of Courtland RTC to the position of the Courtland RTC Administrator and Ms. McLemore from the position of the Courtland RTC Administrator to the position of Director of Operations of the Courtland RTC[2] which then and now exclusively housed and houses and treated and treats young males with a history of sexual dysfunctions and sexual disorders,[3] **intentionally failed to promote him from his then bottom tier employment position as a Courtland RTC shift supervisor of other Courtland RTC employees working also in bottom tier Courtland RTC positions as Counselor Aide, Counselor Aide II, Counselor I and Counselor II to the top tier executive position of the new incoming Courtland RTC PROGRAM DIRECTOR because of his race** although at such time Plaintiff admittedly had no clinical training or clinical experience or prior administrative experience or special knowledge and skills required in this psychiatric in-patient setting devoted exclusively to the treatment of young male adolescents having sexual dysfunctions and sexual disorders or prior experience in a facility such as Courtland RTC which by law was required to meet the JOINT COMMISSION ON THE

---

[2]  Which housed and treated young males, about 35 in number, with a history of sexual dysfunctions and sexual disorders.

[3]  In general the young male adolescents housed by Courtland RTC by the corporate Defendant have great difficulty distinguishing between what is right and what is wrong and actively prey upon others. The Courtland RTC facility through its highly trained clinical personnel attempts to resolve or ameliorate the problems faced by its resident adolescents through psychotropic medicine, psychological counseling and educational services. The Court here notes that the word "psychotropic" is defined as "having an altering effect on the mind, as tranquilizers, hallucinogens, etc.— n. a psychotropic drug." Webster's New World Dictionary of the English Language, Second College Edition, p. 1148.

ACCREDITATION OF HEALTH ORGANIZATIONS ["JCAHO"] and federal MEDICAID standards with respect to such top level, top tier executive position.[4]

### [ORGANIZATIONAL CHART OF COURTLAND RTC]

The Organization Chart of the Three Springs Residential Treatment Center at Courtland, Alabama ["Courtland RTC"] was introduced and received in evidence as COURT EXHIBIT "A" as a part of the summary judgment evidentiary record by stipulation and agreement of counsel of record for the party litigants made on the record at the Summary Judgment oral argument proceedings held in this case on January 10, 1997.  A federal court reporter was present throughout.   All SJ oral argument proceedings were conducted of record.

Court Exhibit "A" [ORGANIZATIONAL CHART] in the form and format of a photocopy thereof appears in its entirety on succeeding page 4 of this MEMORANDUM OPINION and is expressly made a part hereof.

---

[4] The Chicago-based Joint Commission on Accreditation of Health Care Organizations [JCAHO] founded in 1951 and funded largely by the hospital industry and the American Medical Association accredits 11,000 of the nation's hospitals, health care facilities, home health agencies, nursing homes and out patient surgical centers. JCAHO certification is generally required for treatment to be paid by private insurance which then covered 55% of Courtland RTC residents.  McLemore SJ Affidavit: Cook SJ Affidavit.

3

COURT EXHIBIT "A"

Reference to this ORGANIZATIONAL CHART is helpful to an understanding not only of the very top tier clinical-administrative position occupied at Courtland RTC by the PROGRAM DIRECTOR position which Plaintiff Charles L. Carter seeks in this racial discrimination in employment civil litigation, but also of the other top tier and mid-tier positions at Courtland RTC and the very low level non-clinical, non-administrative positions held by Mr. Carter and his counselor colleagues at Courtland RTC from the time Plaintiff first became an entry level part-time employee in 1990 with the title "COUNSELOR AIDE."

Mr. Carter was hired in September 1990 as a part-time employee by Beverly McLemore, one of the decision makers challenged by him in this case. As a part-time Counselor Aide Carter was required to "check [] in with [] your supervisors and follow the instructions given by the supervisor." Plaintiff's Deposition at pp. 151:6 - 152:1. This usually involved watching the students while they participated in sports or other group activities. Plaintiff's Deposition at pp. 152:14 - 153:10. Plaintiff's counselor experience in this entry level job consisted of informal discussions with adolescent residents, in which "you just mainly - sometimes you'd just listen. And if they asked you a question, you'd try to help him solve it." Plaintiff's Deposition p. 154:5 - 154:8.

Charles L. Carter was promoted by Courtland RTC in January, 1991 from his entry level part-time position of Counselor Aide to the job position of COUNSELOR I. Reference to the ORGANIZATIONAL CHART of Courtland RTC shows without dispute that the position of

5

COUNSELOR I was also a very low level job position at the corporate Defendant's Courtland, Alabama facility. This promotion decision was made by Dr. Pam Cook who at that time was the Courtland RTC PROGRAM DIRECTOR and Beverly McLemore who then was the ADMINISTRATOR at Courtland, the two top executive positions at this geographical location. As noted earlier, Dr. Cook and Ms. McLemore are the decision makers challenged by Plaintiff Charles L. Carter in this case. Mr. Carter was a 57 year old black male at the time of this particular promotion. The non-clinical job position of COUNSELOR I had the additional responsibility of teaching a course in rudimentary life skills. Plaintiff at Deposition pp. 156:22 - 157:5; 158:3 - 158:16; 159:8 - 159:19. Except for the addition of teaching the life skills course, Plaintiff's responsibilities remained essentially the same. Plaintiff Deposition pp. 158:3 - 158-16; 103:10 - 103:15.

In May 1992, Plaintiff Carter received another promotion from Dr. Cook and Ms. McLemore, this time to the non-clinical position of COUNSELOR II, which involved substantially the same duties as Plaintiff's Counselor I job position [Defendant's Exhibit 10 to Plaintiff's Deposition - Counselor II job description; McLemore SJ Affidavit; Dr. Cook SJ Affidavit].

In September 1992 Plaintiff Charles L. Carter was appointed SHIFT SUPERVISOR, another non-clerical position at Courtland RTC, by Dr. Cook, placing him in a supervisory role only over other non-clerical counselors on his shift. Plaintiff was a 59 year old black male at the time of both promotions. Exhibit 2 to Beverly

6

McLemore SJ Affidavit [Plaintiff's resume].  Plaintiff did not seek
either position; he received them from his supervisors, including
Dr. Pam Cook and Ms. McLemore.  Plaintiff Deposition pp. 164:21 -
165:11 [Shift Supervisor]; 174:4 - 174:7 [Counselor II]; McLemore
Deposition at 60:9 - 60:18.

Reference to the ORGANIZATIONAL CHART shows conclusively that
all job positions held by Charles L. Carter at the Courtland RTC
facility from the time of his part-time Counselor Aide entry level
position in 1990 until January 1993 when Carter held the position
of Shift Supervisor and when the position of PROGRAM DIRECTOR at
Courtland RTC became vacant were very low level and low tier job
positions [non-clinical] at this clinical facility for young male
adolescents having sexual dysfunctions and other sexual disorders.[5]

The summary judgment evidentiary record in this civil
litigation conclusively shows without contradiction that since
joining Courtland RTC in 1990 until January 1993 **when the position
of PROGRAM DIRECTOR at this facility became vacant Plaintiff
Charles L. Carter had not worked in any Courtland RTC job position
that required CLINICAL KNOWLEDGE of MALE Sexual Dysfunctions or
other male sexual disorders treated at Courtland RTC and that this
Plaintiff had not otherwise gained or developed that expertise**

---

[5] The Sexual Dysfunctions are characterized by disturbance in sexual desire and in the
psychophysiological changes that characterize the sexual response cycle and cause marked distress and
interpersonal difficulty.  The Sexual Dysfunctions include Sexual Desire Disorders [i.e., Hyperactive Sexual
Desire Disorder, Male Orgasmic Disorder, Premature Ejaculation], Sexual Pain Disorders [i.e., Dyspareunia],
Sexual Dysfunction Due To A General Medical Condition, Substance-Induced Dysfunction and Sexual
Dysfunction Not Otherwise Specified.  DIAGNOSTIC AND STATICAL MANUAL OF MENTAL
DISORDERS, Fourth Edition, DSM-VI™, published by the American Psychiatric Association, Washington,
D.C.

**required in a psychiatric in-setting devoted to the treatment of male sexual disorders.** Moreover, before coming to Courtland RTC in 1990 as a part-time Counselor Aide entry level low tier employee this Plaintiff had no significant or meaningful counseling expertise that would be relevant in this Courtland RTC facility for treatment of young male adolescents with sexual dysfunctions and sexual disorders. Plaintiff Deposition at pp. 26:11 - 29:13; 31:1 - 35:11; 41:11 - 42:23, 44:2 - 44:21; 46:19 - 48:14; 71:12 - 71:21. As a matter of fact, when asked during his deposition the definition of an array of clinical terms, Plaintiff was unable to define even one. Plaintiff Deposition at pp. 77:2 - 79:14; 143:8 - 143:20; 145:21 - 146:5. Plaintiff also lacked a basic understanding of the duties of Program Director at Courtland RTC. Plaintiff Deposition at pp. 107:19 - 108:8; 108:20; 108:23; 115:14 - 115:17; 117:16 - 117:21; 122:-5; 122:10; 125:11 - 125:18. Furthermore, neither Plaintiff's job as Counselor II at Courtland RTC nor his prior experience gave him a significant understanding of the principal purpose of the Courtland RTC facility; the treatment of male adolescent sexual disorders. Plaintiff Deposition at pp. 99:15 - 100:1; 103:22 - 104:13.

The ORGANIZATIONAL CHART, Court Exhibit "A", is also helpful to an understanding of the overall staff complement of Courtland RTC as well as the various Courtland RTC job positions held by various Afro-American employees, both male and female, of this Courtland, Alabama Three Springs Residential Treatment Center whose summary judgment AFFIDAVITS [10 in number] have been offered in

8

evidence in opposition to summary judgment by the Summary Judgment Adverse Party Charles L. Carter and which the Summary Judgment Movant/Defendant has timely filed MOTION TO STRIKE assigning a plethora of grounds and brief and argument in support thereof. Four [4] of such Affiants worked at Courtland RTC in the low tier, low level, non-clinical position of COUNSELOR AIDE: [1] Tyron Bowling, a black male who was employed in such non-clinical, low level position for less than 1 year in 1993; [2] Rudolph Nails, a black male who was employed in such non-clinical, low level position from 2/91 through 7/91; [3] Samuel Brewer, a black male who was employed in such non-clinical, low level position from 6/92 through 8/92, less than 3 months; and [4] Ronnie Johnson, a black male, who was employed in such non-clinical, low level position from 8/90 to 1/92. One of such Affiants, Marion Mims, a black female who also taught school in the Muscle Shoals City School System during the time she worked at Courtland RTC, was employed at Courtland RTC in the low level, low tier, non-clinical position of Counselor II from 1992 through 1994 and may have also served as a worker in the Education Program of this psychiatric facility for young male adolescents with sexual dysfunctions during certain summer months of her identified Courtland RTC employment period. Another such SJ Affiant, Margarett Allen, a black female, worked at Courtland RTC from May 1991 through August 1991, a period of four months, as Education Director [during her employment Plaintiff Charles L. Carter was working at Courtland RTC as Counselor Aide, a job description previously identified]. Arlene Hall, a black

9

female and another SJ Affiant, worked as an LPN in the <u>Nurses</u> Group at Courtland RTC on two different occasions within the past 5 years, less than a full year in each employment period. She was apparently a supervisor of Charles L. Carter during her first working period at Courtland RTC. <u>Tina Carter</u>, another SJ Affiant, worked as LPN in charge in the NURSES Group at Courtland RTC from 6/90 to 9/91 and was Charles L. Carter's supervisor when he worked part-time at Courtland RTC as a Counselor Aide. SJ Affiant <u>Annie M. Cobb</u>, a black female, worked at Courtland RTC in the Nurses Group as an LPN and shift supervisor during the 1/90 through 5/93 time frame. The last position held by Ms. Cobb at Courtland RTC [time frame not identified] was Assistant Director of Nursing at which time she occupied a supervisory position over Plaintiff Carter. Finally, SJ Affiant <u>Greg Jones</u>, a black male, worked at Courtland RTC in several employment categories from April 1991 to February 1996. He was employed as a Counselor Aide from 4/7/91 to 11/1/92, as a Shift Supervisor in 12/92 [counselor tier level] and as a Counselor Aide II on 4/15/93. He had some limited supervisory authority over Mr. Carter. The last position held by Greg Jones was Activity Therapist which is one tier level above the "COUNSELOR" group.

10

**CRITERIA BASED POSITION DESCRIPTION
AND PERFORMANCE APPRAISAL**

TITLE:   PROGRAM DIRECTOR

This document was introduced in evidence in support of Summary Judgment by the SJ Movant/Defendant Three Springs Residential Treatment Center [Defendant's Exhibit No. 6] and in opposition to Summary Judgment by the SJ/Adverse Party Plaintiff Charles L. Carter [Plaintiff's Exhibit No. Tab #14].   It is reproduced verbatim by this Court in the form and format of a fully legible photocopy of Defendant's Exhibit No. 6 [identical to Plaintiff's Tab #14] which appears as succeeding page 12 of this MEMORANDUM OPINION.



THREE SPRINGS RESIDENTIAL TREATMENT CENTER
Courtland, AL

Criteria Based Position Description and Performance Appraisal

TITLE:  Program Director

SUMMARY PERFORMANCE DESCRIPTION:  The Program Director is
responsible for the sound management and effective service of
all clinical departments.  This position coordinates the
clinical services of the facility to maximize effectiveness
and eliminate duplication of effort.

REPORTS TO:  Administrator

ACCOUNTABILITY AND AUTHORITY:  Under the direction of the
Administrator, the Program Director provides direct
supervision to all clinical department heads and is
accountable for the functioning of these departments.

SUPERVISES:  Director of Activities Therapy, Director of
Educational Services, Teachers, Counselor Aides, and Staff
Nurses (in program related duties).

POSITION REQUIREMENTS:

EDUCATION:  Master's degree from an accredited college or
university in mental health-related clinical field, or
administrative field, or Ph.D. in clinical or administrative
area.

EXPERIENCE:  Three to five years of clinical experience with
prior administrative experience in a psychiatric in-patient
setting.  Licensure or certification by appropriate state
body if applicable to educational degree.  Prior experience
in facility which meets JCAHO and Medicare standards desired.

SPECIAL KNOWLEDGE AND SKILLS:  1) Exceptional verbal and
written skills are required to effectively  express ideas and
views when  (a) speaking to groups, medical staff, clinical
personnel, and administrator; (b) for preparing written
reports in technical language; for (c) clarify in supervising
and delegating responsibility to department heads. 2) Ability
to evaluate and utilize data from statistical reports,
budgets, descriptions of programs. 3) Must possess initiative
and judgement capabilities to organize and plan activities,
formulate policies, delegate responsibility, to organize and
plan activities, formulate policies, delegate responsibility,
systematize procedures, promote favorable public relations
and make decisions affecting service delivery to patients.
4) Must be capable of relating to people in a manner to win
confidence and establish support.  Must be flexible to adjust
to changing conditions and the various details of the job.

This Court will hereafter REVISIT the criteria based position description and performance appraisal of the position of PROGRAM DIRECTOR of the Courtland RTC facility in January 1993 [which is the time frame within which Plaintiff claims he **intentionally** was not appointed to such position by Dr. Pam Cook and Ms. Beverly McLemore **because he was a black male**] after this Court presents on succeeding pages 14, 15 and 16 of this MEMORANDUM OPINION in verbatim photocopy form and format the RESUME OF CHARLES L. CARTER which was introduced in the SUMMARY JUDGMENT EVIDENTIARY RECORD by Plaintiff Carter as Plaintiff's TAB #16, one of the 18 exhibits introduced in evidence in this case by Plaintiff on January 3, 1997 in opposition to Defendant's MOTION FOR SUMMARY JUDGMENT.

13

<u>RESUME</u>

July 1989

| | |
|---|---|
| NAME: | Charles Lester Carter |
| ADDRESS: | Route One, Box 100B<br>Sheffield, AL  35660 |
| TELEPHONE: | Home (205) 446-8553 |
| DATE OF BIRTH: | April 17, 1933 |
| MARITAL STATUS: | Married, Three Children |
| RELIGIOUS AFFILIATION: | Baptist |

<u>EDUCATIONAL BACKGROUND</u>:

1952    Central High School, Courtland, Alabama.  Diploma.

1956    Alabama State University, BS Degree, Physical Educational & History

1962    June-August, Alabama State University.  Graduate School, Educational Administration-Guidance.

1963    Tennessee State University, Graduate School, Educational Administration-Guidance.

1964    June-August, Indiana University.  Graduate School, Educational Administration-Guidance.

1966    June-August, Indiana University.  M.S.  Educational Administration-Guidance.

1971    Fellowship Approved For Auburn University For Displaced Principals Because Of Integration In Educational Administration and Curriculum.

1972    Summer Workshop, Indiana University.  Graduate School, Educational Administration (Middle School Curriculum).

1973    Summer Workshop, University of Alabama, Workshop, Southern Association Leadership Training, Educational Administration-Guidance.

1972-
1975    University of Alabama Selected Courses Toward AA Certificate, Educational Administration Curriculum-Guidance.

<div align="center">EXHIBIT 16</div>

1974        Ford Foundation Leadership Development Program Fellowship
            Award To Study Community Relations, Race Relations,
            Innovated Programs In Educational Administration And
            Curriculum.

1975        Workshop, State Department Of Education. Educational
            Leadership, 3 Hour Credit, Educational Administration.

1975        Internship - January 30-31, Macon County Board of
            Education (Observing Their School System) Elementary And
            Secondary Curriculum.

1975        December, AA, University of Alabama, Educational
            Administration And Curriculum.


## MEETINGS ATTENDED FOR FORD FOUNDATION

1974        Blackburg, VA, August 6-11, Five Days Participation In
            Group Training, Briefing, And Orientation Sessions,
            Workshop, State And Regional Post Fellow Association
            Meetings, And Individual Conferences For Further Program
            Refinement And Clarifications In Leadership Development.

1974        Atlanta, GA, 1974-75 Attended Ford Seminar With
            Foundation Orientation, And Feedback Sessions And
            Individual Conferences For Further Program Refinement And
            Clarification In Leadership.

1975        AA University Of Alabama In Educational Administration.

1976        Summer, Mott Foundation, Stipend, Community Education.

1976        October, Interviewed And Runner-Up For Assistant State
            Superintendent of Education In Alabama.

1976        December, State Workshop In Community Education In
            Huntsville.

## EXPERIENCE

1956-60     Football, Basketball And Track Coach At Cherokee High
            School, Colbert County.

1960-67     Teacher-Principal, Webster Junior High School, Muscle
            Shoals, Alabama.

1967-70     Teacher, Head Start Program, Muscle Shoals, Alabama.

1971-72     Teacher, Physical Education, Avalon Middle School And
            Muscle Shoals High School, Muscle Shoals, Alabama.

1972        August, 1971 - February 1, 1972, Teacher Seventh Grade
            History, Avalon Middle School, Muscle Shoals, Alabama.

1972        February 1, Principal, Avalon Middle School, Appointed
            Principal.

1977-78     Alabama State University, Instructor, Graduate School In
            Educational Administration.

1978-81     Project Director, Recruitment And Training Program,
            Funded By U.S. Department Of Labor.

1981-82     Consultant For Attorney Donald Watkins.*

1982-88     Principal Of Bullock County High School And Area
            Vocational School (Bullock County)

1988-89     Retired And Served As A Consultant For Bullock County
            Board of Education.

Court Note:

*Attorney Donald Watkins whom this HM Judge has known throughout
Mr. Watkins practice of law in the State of Alabama is an Afro-
American citizen and a highly successful civil rights lawyer
[practice not limited to this field] with law offices located in
Montgomery, Alabama.  The Alabama Lawyer, Vol. 57, No. 4, 1996.

### COURT OBSERVATIONS WITH RESPECT TO THE
### RESUME OF PLAINTIFF CHARLES L. CARTER

In the 6th entry under <u>EXPERIENCE</u> in the RESUME OF CHARLES L. CARTER and for the 1972 calendar year appears the following entry:

1972        February 1, Principal, Avalon Middle School, Appointed Principal.

The 7th entry of such Resume for the years 1977-78 reads verbatim as follows:

1977-78      Alabama State University, Instructor, Graduate School In Educational Administration.

This federal district court considers that Plaintiff Carter's 6th resume entry above set out is incomplete in that such entry does not disclose what Mr. Carter's work tenure as principal of Avalon Middle School was nor when that principalship began or ended. This omitted information is found in that certain UNPUBLISHED OPINION of the United States Court of Appeals For The Eleventh Circuit issued by that appellate court on February 5, 1982 in Case No. 81-7247 [D.C. Docket No. CA 77-M-1104] in that certain appeal styled:

CHARLES L. CARTER,

Plaintiff-Appellant

versus

MUSCLE SHOALS CITY BOARD OF EDUCATION,

Defendant-Appellees

which was filed in the Office of the Clerk of this Court on March

17

15, 1982.  Full and complete copy of this opinion was introduced in evidence by the Defendant Three Springs Residential Treatment Center in support of its Motion For Summary Judgment in the summary judgment evidentiary proceeding in the above-entitled civil action [without objection] as Exhibit No. 9 of the SJ Movant/Defendant [See Defendant's Evidentiary Submission In Support Of Defendant's Motion For Summary Judgment filed herein on November 15, 1996].

The BACKGROUND FACTS appearing on pages 2 and 3 of this unpublished Opinion serve to complete Mr. Carter's submitted RESUME in the present civil action insofar as his Avalon Middle School principalship is concerned.  They read as follows:

## BACKGROUND

On February 1, 1972, Charles Carter was appointed principal of the Avalon Middle School pursuant to Lee v. Macon County Board of Education (Muscle Shoals School System), 453 F.2d 1104 (5th Cir. 1971).[1]

Carter served as principal of Avalon Middle School until May, 1877, when a dispute over a cheerleader's election led to a confrontation with his immediate supervisor, Maudine Smith, administrative principal of both Avalon Middle School and Muscle Shoals High School which are the same campus.

Carter had revised the cheerleader election procedure by removing the balloting from the homerooms and centralizing it in the library.  Carter tallied the ballots and announced that two black youngsters were elected

---

[1] Carter, who is black, was suspended from his principalship of an all-black school when it was closed pursuant to a desegregation order in 1967.  Between 1967 and 1971, principalships in three of Muscle Shoals four schools became vacant.  Each was filled by a white person.  Carter sued in 1971 after the Avalon Middle School principalship became vacant and was filled by a white.  Carter alleged he was denied the appointment because of race.  Lee held that the school board had violated the court's holding in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1970), cert denied, 396 U.S. 1032 (1970).

18

cheerleaders. A protest was lodged by disappointed white candidates. Smith requested the ballots from Carter so she could check the tabulation. Carter refused to permit Smith to remove the ballots from his office. Because it was late in the day, Smith agreed to return the following morning and review the ballots. The next morning, Carter again refused to permit Smith to remove the ballots from his office. Smith, Carter's superior, then ordered Carter to surrender the ballots. After Carter again refused, Smith called the superintendent of schools, Don Heidorn, and informed him of the incident. Heidorn instructed Smith to have Carter sign a statement setting out his refusal to release the ballots. Carter refused to go to Smith's office, refused to read the statement, and refused to sign it. Smith then requested students to witness a notation on the statement saying Carter refused to sign it. Carter took the statement from the students and tore it up. He then physically struggled with Smith, preventing her from telephoning Heidorn.

Smith retreated to her office and called Heidorn. Heidorn came to the school and took oral statements from witnesses, including Carter, and order Carter to turn over the ballots. Carter complied with this order.

The school board met that night and voted to suspend Carter, and it informed Carter of the suspension by letter the next day. By letter dated May 18, 1977, the board informed Carter of its proposal to cancel his contract. A public hearing was held from June 4, 1977, to August 4, 1977. The board voted to dismiss Carter on August 9, 1977.

Carter attended the public hearing and was represented by counsel. He cross-examined witnesses, but was not permitted to cross-examine board members. The board rejected Carter's argument that two board members were biased because they had been defendants in the earlier Lee case. Carter appealed his dismissal to the Alabama Teacher Tenure Commission which held his dismissal was procedurally consistent with the Alabama Teacher Tenure Law, and was neither the product of personal nor political bias, or unjust or arbitrary. Carter did not appeal this decision.

We must decide whether the trial court erred in determining that the Muscle Shoals City Board of Education was not racially motivated in dismissing Carter, and that Carter's due process rights were not violated.

19

**Court Note 1: The CONCLUSION of this unpublished Opinion succinctly states the holding of the Eleventh Circuit in the following words:**

## CONCLUSION

Because we find that the trial court was not clearly erroneous in its determination that Carter was dismissed for cause, and that Carter's due process rights were not violated, we affirm.

Because we find that Carter's claim was not frivolous, or groundless, we vacate the award of attorney's fees.

## AFFIRMED IN PART, VACATED IN PART

The Court here emphasizes that the fact that Mr. Carter secured his principalship at Avalon Middle School in the City of Muscle Shoals, Alabama in February 1972 via mandate of the former Fifth Circuit Court of Appeals is not construed by this Court to suggest or infer that he was not qualified for that position when he obtained it by federal court order or during his several year tenure in such position thereafter. Neither does this Court draw any unfavorable inference with respect to Mr. Carter's claim in the present civil litigation that he was qualified for the position of PROGRAM DIRECTOR at the Courtland RTC facility in January 1993 by reason of the fact that he lost his Avalon Middle School principalship by vote of the Muscle Shoals City Board of Education on August 9, 1977, which action was affirmed by both the United States District Court For The Northern District Of Alabama [at the trial court level] and on appeal by the United States Court of Appeal For The Eleventh Circuit with both courts holding that the Muscle Shoals City Board of Education was not racially motivated in dismissing Mr. Carter from his Avalon Middle School principalship

20

and that his due process rights and his rights to equal protection of the law were not violated.

### RESPONSIBILITIES OF THE COURTLAND RTC PROGRAM DIRECTOR

As previously described in the Courtland RTC PROGRAM DIRECTOR job description section of this Memorandum Opinion, *ante* p. 12, this top executive position at the Courtland, Alabama facility required someone with a master's degree in a mental health or administrative field, three to five years clinical experience with administrative responsibilities in a psychiatric in-patient facility and a number of special skills and knowledge. Moreover, this Program Director slot carried numerous job responsibilities which included: *[1] supervising the clinical department heads which included conversing with them in their language; [2] overseeing compliance by Courtland RTC with the Joint Commission on the Accreditation of Health Organization ["JCAHO"] and federal Medicaid standards [see n. 4, ante p. 3]; [3] preparing clinical, statistical and financial reports for internal use and submission to JCAHO and the federal and state government [reports which require a familiarity with the technical language used in the field of sexual dysfunctions and sexual offender treatment]; [4] organizing and planning in-house activities for adolescent residents and staff; and [5] conveying Courtland RTC policies and procedures to staff and professional groups.* Furthermore, a working knowledge of the requirements of the job of Program Director of Courtland RTC entails, importantly, a knowledge and an

21

understanding of a number of psychiatric terms commonly used in the field of sexual disorders treatment such as *exhibitionism, fetishism, pedophilia, masochism, sadism* and *voyeurism*, as defined in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Fourth Edition, published by the American Psychiatric Association, Sexual and Gender Identity Disorders, pp. 525-532, inclusive, and the types of medication used for adolescent residents at Courtland RTC, as well as what the various assessments performed at Courtland RTC were called. The correct citation for this book which has almost biblical importance and acceptance in the psychiatric field in the United States is: "American Psychiatric Association: *Diagnostic And Statistical Manual Of Mental Disorders,* **Fourth Edition.** Washington, D.C., **American Psychiatric Association, 1994.**

Pages 525-532, inclusive, from the above identified <u>Diagnostic And Statistical Manual Of Mental Disorders</u>, Fourth Edition, published by the American Psychiatric Association are reproduced in the form and format of photocopy of each such page which collectively appear as pp. 23 through 32, inclusive of this MEMORANDUM OPINION.

22

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

### FOURTH EDITION

# DSM-IV™



PUBLISHED BY THE
AMERICAN PSYCHIATRIC ASSOCIATION
WASHINGTON, DC

23

Copyright © 1994 American Psychiatric Association

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Manufactured in the United States of America on acid-free paper

American Psychiatric Association
1400 K Street, N.W., Washington, DC  20005

Correspondence regarding copyright permissions should be directed to the Division of Publications and Marketing, American Psychiatric Association, 1400 K Street, N.W., Washington, DC 20005.

DSM and DSM-IV are trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

The correct citation for this book is American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition. Washington, DC, American Psychiatric Association, 1994.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-IV. — 4th ed.
    p.   cm.
    Prepared by the Task Force on DSM-IV and other committees and work
groups of the American Psychiatric Association.
    Includes index.
    ISBN 0-89042-061-0 (hard : alk. paper). — ISBN 0-89042-062-9 (paper : alk. paper)
    1. Mental illness—Classification.   2. Mental illness—Diagnosis.
I. American Psychiatric Association.  II. American Psychiatric
Association. Task Force on DSM-IV.  III. Title: DSM-IV.
    [DNLM: 1. Mental Disorders—classification.  2. Mental Disorders—
diagnosis.   WM 15 D536 1994]
RC455.2.C4D54    1994
616.89'075—dc20
DNLM/DLC
for Library of Congress                                              94-6304
                                                                        CIP

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

First printing, May 1994
Second printing, July 1994
Third printing, August 1994
Fourth printing, January 1995

Text Design—Jane H. Davenport
Manufacturing—R. R. Donnelley & Sons Company

...finish with advancing age in adults. The behaviors

# 302.4   Exhibitionism

The paraphiliac focus in Exhibitionism involves the exposure of one's genitals to a stranger. Sometimes the individual masturbates while exposing himself (or while fantasizing exposing himself). If the person acts on these urges, there is generally no attempt at further sexual activity with the stranger. In some cases, the individual is aware of a desire to surprise or shock the observer. In other cases, the individual has the sexually arousing fantasy that the observer will become sexually aroused. The onset usually occurs before age 18 years, although it can begin at a later age. Few arrests are made in the older age groups, which may suggest that the condition becomes less severe after age 40 years.

---

■ **Diagnostic criteria for 302.4 Exhibitionism**

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving the exposure of one's genitals to an unsuspecting stranger.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

## 302.81   Fetishism

The paraphiliac focus in Fetishism involves the use of nonliving objects (the "fetish"). Among the more common fetish objects are women's underpants, bras, stockings, shoes, boots, or other wearing apparel. The person with Fetishism frequently masturbates while holding, rubbing, or smelling the fetish object or may ask the sexual partner to wear the object during their sexual encounters. Usually the fetish is required or strongly preferred for sexual excitement, and in its absence there may be erectile dysfunction in males. This Paraphilia is not diagnosed when the fetishes are limited to articles of female clothing used in cross-dressing, as in Transvestic Fetishism, or when the object is genitally stimulating because it has been designed for that purpose (e.g., a vibrator). Usually the Paraphilia begins by adolescence, although the fetish may have been endowed with special significance earlier in childhood. Once established, Fetishism tends to be chronic.

---

■ **Diagnostic criteria for 302.81 Fetishism**

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving the use of nonliving objects (e.g., female undergarments).

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

C. The fetish objects are not limited to articles of female clothing used in cross-dressing (as in Transvestic Fetishism) or devices designed for the purpose of tactile genital stimulation (e.g., a vibrator).

---

The parap[...] senting per[...] can more [...] vehicles). [...] genitalia or [...] caring rela[...] prosecution [...] begins by a[...] after which [...]



■ **Di[...]**

A. [...]

B. [...]

The paraphili[...] (generally ag[...] or older and [...] with Pedophi[...] used; both th[...] account. Indi[...] particular age[...] aroused by b[...] 10-year-olds, [...] Pedophilia in[...] male victims. [...] (Exclusive Typ[...] Individuals wi[...] to undressing t[...] of the child, o[...] fellatio or cunn[...] their fingers, fo[...] activities are c[...] "educational va[...]

# 302.89  Frotteurism

The paraphiliac focus of Frotteurism involves touching and rubbing against a noncon-senting person. The behavior usually occurs in crowded places from which the individual can more easily escape arrest (e.g., on busy sidewalks or in public transportation vehicles). He rubs his genitals against the victim's thighs and buttocks or fondles her genitalia or breasts with his hands. While doing this he usually fantasizes an exclusive, caring relationship with the victim. However, he recognizes that to avoid possible prosecution, he must escape detection after touching his victim. Usually the paraphilia begins by adolescence. Most acts of frottage occur when the person is ages 15–25 years, after which there is a gradual decline in frequency.

---

■ **Diagnostic criteria for 302.89 Frotteurism**

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving touching and rubbing against a nonconsenting person.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

# 302.2  Pedophilia

The paraphiliac focus of Pedophilia involves sexual activity with a prepubescent child (generally age 13 years or younger). The individual with Pedophilia must be age 16 years or older and at least 5 years older than the child. For individuals in late adolescence with Pedophilia, no precise age difference is specified, and clinical judgment must be used; both the sexual maturity of the child and the age difference must be taken into account. Individuals with Pedophilia generally report an attraction to children of a particular age range. Some individuals prefer males, others females, and some are aroused by both males and females. Those attracted to females usually prefer 8- to 10-year-olds, whereas those attracted to males usually prefer slightly older children. Pedophilia involving female victims is reported more often than Pedophilia involving male victims. Some individuals with Pedophilia are sexually attracted only to children (Exclusive Type), whereas others are sometimes attracted to adults (Nonexclusive Type). Individuals with Pedophilia who act on their urges with children may limit their activity to undressing the child and looking, exposing themselves, masturbating in the presence of the child, or gentle touching and fondling of the child. Others, however, perform fellatio or cunnilingus on the child or penetrate the child's vagina, mouth, or anus with their fingers, foreign objects, or penis and use varying degrees of force to do so. These activities are commonly explained with excuses or rationalizations that they have "educational value" for the child, that the child derives "sexual pleasure" from them, or

**528    Sexual and Gender Identity Disorders**

that the child was "sexually provocative"—themes that are also common in pedophiliac pornography.

Individuals may limit their activities to their own children, stepchildren, or relatives or may victimize children outside their families. Some individuals with Pedophilia threaten the child to prevent disclosure. Others, particularly those who frequently victimize children, develop complicated techniques for obtaining access to children, which may include winning the trust of a child's mother, marrying a woman with an attractive child, trading children with other individuals with Pedophilia, or, in rare instances, taking in foster children from nonindustrialized countries or abducting children from strangers. Except in cases in which the disorder is associated with Sexual Sadism, the person may be attentive to the child's needs in order to gain the child's affection, interest, and loyalty and to prevent the child from reporting the sexual activity. The disorder usually begins in adolescence, although some individuals with Pedophilia report that they did not become aroused by children until middle age. The frequency of pedophiliac behavior often fluctuates with psychosocial stress. The course is usually chronic, especially in those attracted to males. The recidivism rate for individuals with Pedophilia involving a preference for males is roughly twice that for those who prefer females.

---

■ **Diagnostic criteria for 302.2 Pedophilia**

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.

   **Note:** Do not include an individual in late adolescence involved in an ongoing sexual relationship with a 12- or 13-year-old.

*Specify* if:
   **Sexually Attracted to Males**
   **Sexually Attracted to Females**
   **Sexually Attracted to Both**

*Specify* if:
   **Limited to Incest**

*Specify* type:
   **Exclusive Type** (attracted only to children)
   **Nonexclusive Type**

---

# 302.83  Sexual Masochism

The paraphiliac focus of Sexual Masochism involves the act (real, not simulated) of being humiliated, beaten, bound, or otherwise made to suffer. Some individuals are bothered by their masochistic fantasies, which may be invoked during sexual intercourse or masturbation but not otherwise acted on. In such cases, the masochistic fantasies usually involve being raped while being held or bound by others so that there is no possibility of escape. Others act on the masochistic sexual urges by themselves (e.g., binding themselves, sticking themselves with pins, shocking themselves electrically, or self-mutilation) or with a partner. Masochistic acts that may be sought with a partner include restraint (physical bondage), blindfolding (sensory bondage), paddling, spanking, whipping, beating, electrical shocks, cutting, "pinning and piercing" (infibulation), and humiliation (e.g., being urinated or defecated on, being forced to crawl and bark like a dog, or being subjected to verbal abuse). Forced cross-dressing may be sought for its humiliating associations. The individual may have a desire to be treated as a helpless infant and clothed in diapers ("infantilism"). One particularly dangerous form of Sexual Masochism, called "hypoxyphilia," involves sexual arousal by oxygen deprivation obtained by means of chest compression, noose, ligature, plastic bag, mask, or chemical (often a volatile nitrite that produces a temporary decrease in brain oxygenation by peripheral vasodilation). Oxygen-depriving activities may be engaged in alone or with a partner. Because of equipment malfunction, errors in the placement of the noose or ligature, or other mistakes, accidental deaths sometimes occur. Data from the United States, England, Australia, and Canada indicate that one to two hypoxyphilia-caused deaths per million population are detected and reported each year. Some males with Sexual Masochism also have Fetishism, Transvestic Fetishism, or Sexual Sadism. Masochistic sexual fantasies are likely to have been present in childhood. The age at which masochistic activities with partners first begins is variable, but is commonly by early adulthood. Sexual Masochism is usually chronic, and the person tends to repeat the same masochistic act. Some individuals with Sexual Masochism may engage in masochistic acts for many years without increasing the potential injuriousness of their acts. Others, however, increase the severity of the masochistic acts over time or during periods of stress, which may eventually result in injury or even death.

---

**■ Diagnostic criteria for 302.83 Sexual Masochism**

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving the act (real, not simulated) of being humiliated, beaten, bound, or otherwise made to suffer.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

# 302.84   Sexual Sadism

The paraphiliac focus of Sexual Sadism involves acts (real, not simulated) in which the individual derives sexual excitement from the psychological or physical suffering (including humiliation) of the victim. Some individuals with this Paraphilia are bothered by their sadistic fantasies, which may be invoked during sexual activity but not otherwise acted on; in such cases the sadistic fantasies usually involve having complete control over the victim, who is terrified by anticipation of the impending sadistic act. Others act on the sadistic sexual urges with a consenting partner (who may have Sexual Masochism) who willingly suffers pain or humiliation. Still others with Sexual Sadism act on their sadistic sexual urges with nonconsenting victims. In all of these cases, it is the suffering of the victim that is sexually arousing. Sadistic fantasies or acts may involve activities that indicate the dominance of the person over the victim (e.g., forcing the victim to crawl or keeping the victim in a cage). They may also involve restraint, blindfolding, paddling, spanking, whipping, pinching, beating, burning, electrical shocks, rape, cutting, stabbing, strangulation, torture, mutilation, or killing. Sadistic sexual fantasies are likely to have been present in childhood. The age at onset of sadistic activities is variable, but is commonly by early adulthood. Sexual Sadism is usually chronic. When Sexual Sadism is practiced with nonconsenting partners, the activity is likely to be repeated until the person with Sexual Sadism is apprehended. Some individuals with Sexual Sadism may engage in sadistic acts for many years without a need to increase the potential for inflicting serious physical damage. Usually, however, the severity of the sadistic acts increases over time. When Sexual Sadism is severe, and especially when it is associated with Antisocial Personality Disorder, individuals with Sexual Sadism may seriously injure or kill their victims.

---

### ■ Diagnostic criteria for 302.84 Sexual Sadism

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving acts (real, not simulated) in which the psychological or physical suffering (including humiliation) of the victim is sexually exciting to the person.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

# 302.3   Transvestic Fetishism

The paraphiliac focus of Transvestic Fetishism involves cross-dressing. Usually the male with Transvestic Fetishism keeps a collection of female clothes that he intermittently uses to cross-dress. While cross-dressed, he usually masturbates, imagining himself to be both the male subject and the female object of his sexual fantasy. This disorder has

been described only in heterosexual males. Transvestic Fetishism is not diagnosed when cross-dressing occurs exclusively during the course of Gender Identity Disorder. Transvestic phenomena range from occasional solitary wearing of female clothes to extensive involvement in a transvestic subculture. Some males wear a single item of women's apparel (e.g., underwear or hosiery) under their masculine attire. Other males with Transvestic Fetishism dress entirely as females and wear makeup. The degree to which the cross-dressed individual successfully appears to be a female varies, depending on mannerisms, body habitus, and cross-dressing skill. When not cross-dressed, the male with Transvestic Fetishism is usually unremarkably masculine. Although his basic preference is heterosexual, he tends to have few sexual partners and may have engaged in occasional homosexual acts. An associated feature may be the presence of Sexual Masochism. The disorder typically begins with cross-dressing in childhood or early adolescence. In many cases, the cross-dressing is not done in public until adulthood. The initial experience may involve partial or total cross-dressing; partial cross-dressing often progresses to complete cross-dressing. A favored article of clothing may become erotic in itself and may be used habitually, first in masturbation and later in intercourse. In some individuals, the motivation for cross-dressing may change over time, temporarily or permanently, with sexual arousal in response to the cross-dressing diminishing or disappearing. In such instances, the cross-dressing becomes an antidote to anxiety or depression or contributes to a sense of peace and calm. In other individuals, gender dysphoria may emerge, especially under situational stress with or without symptoms of depression. For a small number of individuals, the gender dysphoria becomes a fixed part of the clinical picture and is accompanied by the desire to dress and live permanently as a female and to seek hormonal or surgical reassignment. Individuals with Transvestic Fetishism often seek treatment when gender dysphoria emerges. The subtype With Gender Dysphoria is provided to allow the clinician to note the presence of gender dysphoria as part of Transvestic Fetishism.

---

### ■ Diagnostic criteria for 302.3 Transvestic Fetishism

A. Over a period of at least 6 months, in a heterosexual male, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving cross-dressing.

B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Specify* if:
   **With Gender Dysphoria:** if the person has persistent discomfort with gender role or identity

---

532    **Sexual and Gender Identity Disorders**

# 302.82   Voyeurism

The paraphiliac focus of Voyeurism involves the act of observing unsuspecting individuals, usually strangers, who are naked, in the process of disrobing, or engaging in sexual activity. The act of looking ("peeping") is for the purpose of achieving sexual excitement, and generally no sexual activity with the observed person is sought. Orgasm, usually produced by masturbation, may occur during the voyeuristic activity or later in response to the memory of what the person has witnessed. Often these individuals have the fantasy of having a sexual experience with the observed person, but in reality this rarely occurs. In its severe form, peeping constitutes the exclusive form of sexual activity. The onset of voyeuristic behavior is usually before age 15 years. The course tends to be chronic.

---

■ **Diagnostic criteria for 302.82 Voyeurism**

   A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving the act of observing an unsuspecting person who is naked, in the process of disrobing, or engaging in sexual activity.

   B. The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

---

These identified pages collectively define SEXUAL EXHIBITIONISM, SEXUAL FETISHISM, PEDOPHILIA, SEXUAL MASOCHISM, SEXUAL SADISM AND VOYEURISM, all sexual disorders with which the PROGRAM DIRECTOR of Courtland RTC in January 1993 was required to be meaningfully and professionally conversant **and about which Plaintiff Charles L. Carter who in this civil lawsuit claims to have been qualified for the Program Director position at Courtland RTC in January 1993 knew absolutely nothing** by his own under oath admissions.   See Mr. Carter's DEPOSITION taken in this case by Defendant on July 1, 1996, pp. 77:203; 78:13-19, 22; 79:3-11, 13-14.

## THE 11/15/96 SJ SUPPORTING AFFIDAVIT OF DEFENDANT'S DECISION-MAKER DR. PAM COOK

### AFFIDAVIT

STATE OF ALABAMA            )

COUNTY OF MADISON        )

My name is Dr. Pamela Cook.  I am a resident of the State of Alabama and over the age of 21 years, and give this Affidavit of my own free will.  I have personal knowledge of the information contained in this Affidavit.

I am currently employed with Three Springs Residential Treatment as Clinical Director.  I have been with Three Springs since October 1990, when I was hired as Program Director at Three Springs' Courtland, Alabama treatment center.  In January 1991, Beverly McLemore and I promoted plaintiff Charles Carter to the full-time position of Counselor (Mrs. McLemore was at that time the Administrator at Courtland).  In May 1992, Mrs. McLemore and I promoted Mr. Carter to the position of Counselor II.  In September 1992, I promoted Mr. Carter to the position of Counselor II shift supervisor.

In November 1992, I was promoted from Program Director to Administrator at Courtland; Mrs.

33

McLemore moved up to Director of Operations at the same time. To fill the Program Director job, Mrs. McLemore and I promoted Ms. Brenda Baird, who had been the Director of Family Services at Courtland. Two months later, however, Ms. Baird resigned, which left the position open in January 1993.

Mrs. McLemore and I were once again in charge of filling the vacancy. Initially, we reviewed the Courtland personnel to determine who met the educational requirement for the job listed on the Program Director job description, which was a master's degree in an administrative or mental health field. Once we narrowed the pool to people with the appropriate educational background, Mrs. McLemore and I looked at each individual's personnel file (including his or her resume) to see who met the remaining job requirements of experience, special skills and knowledge. After this review, Mrs. McLemore and I agreed that Greg Haynes, who was then the Director of Education at Courtland, was the most qualified person available.

I came to this conclusion on the basis of several factors. First, Mr. Haynes had the greatest amount of relevant prior experience. Before joining Courtland in August 1991, Mr. Haynes had been employed at the C.I.T.Y. program in Tuscaloosa, Alabama. C.I.T.Y. was an intervention program aimed at helping adolescents who had become embroiled in the juvenile court system to straighten out their lives. While employed at C.I.T.Y., Mr. Haynes had conducted assessments of the program participants and helped to design treatment for the participants. Mr. Haynes also had been responsible for fashioning the behavioral aspect of C.I.T.Y.'s program and for putting together written and verbal reports using clinical language. Since he came to Courtland in August 1991 as Director of Education, <u>Mr. Haynes had assisted in the substantive treatment of adolescent sexual disorders and had helped in the adoption of federal and Joint Commission standards in the wake of the Joint Commission survey at Courtland in 1992, in which he was also extensively involved. As treatment for a number of Courtland residents at that time was paid for by private insurance, which typically covered treatment only at Joint Commission approved facilities, understanding and meeting Joint Commission standards was one of the key responsibilities of the Program Director. Given this background, I believed Mr. Haynes was the best qualified candidate for the job.</u>

Mr. Carter, in contrast, had no experience in the treatment or assessment of psychologically troubled teens before he started work at Courtland in 1990, and while he had performed acceptably since joining

34

Courtland, he had not held any position that required significant clinical know-how or otherwise demonstrated that capability. In fact, Mr. Carter had problems with the clinical components of the written notes he submitted as a Counselor II, as I noted in his February 1992 performance evaluation. Mr. Carter also fared worse than Mr. Haynes on a number of the special skills and knowledge listed on the Program Director job description.

Mr. Carter's race or age was never discussed in my meetings with Beverly McLemore to fill the Program Director job in January 1993, and Mr. Carter's race and age was not a factor in the decision to promote Mr. Haynes rather than Mr. Carter.

/s/ Dr. Pamelea Cook
DR. PAMELEA COOK

Sworn to and subscribed before me this 15th day of November, 1996.

/s/ Mary Jane Maple
NOTARY PUBLIC

My commission expires: 7/7/97

## THE 11/14/96 SJ SUPPORTING AFFIDAVIT OF DEFENDANT'S DECISION-MAKER BEVERLY McLEMORE

### AFFIDAVIT

STATE OF ALABAMA          )

COUNTY OF MADISON          )

My name is Beverly McLemore. I am a resident of the State of Alabama and over the age of 21 years, and give this Affidavit of my own free will. I have personal knowledge of the information contained in this Affidavit.

I am currently employed with Three Springs Residential Treatment as Vice-President of Operations.

35

I have been with Three Springs since October 1989.  In September 1990, I hired the plaintiff in this case, Charles Carter, to work at Three Springs' Courtland facility as a part-time Counselor's Aide.  In January 1991, along with Dr. Pam Cook, who was at that time the Program Director at Courtland, I promoted Mr. Carter to the full-time position of Counselor.  In May 1992, I promoted Mr. Carter to the position of Counselor II, again in conjunction with Dr. Cook.

In November 1992, I was promoted from Administrator to Director of Operations, and Dr. Cook became Administrator.  Two months later, in January 1993, an opening occurred in the position of Program Director.  See Exhibit 1 (Courtland personnel chart).  Dr. Cook and I were responsible for selecting a person to fill the vacancy.  After considering the qualifications of all Courtland employees with a master's degree in an administrative or mental health field, which included a review of relevant personnel files and resumes. See Exhibit 2 (Carter and Haynes resumes).

Dr. Cook and I agreed that Greg Haynes was the best qualified person for the Program Director job. In making that decision, Dr. Cook and I looked at all the candidates' experience in the area of mental health, both before the employees joined Three Springs and since they had begun working with us.  Mr. Haynes had previously worked as educational coordinator at the C.I.T.Y. program in Tuscaloosa, Alabama, which focused on adolescents who had run into trouble with the law for crimes including sexual assault.  In that job, Mr. Haynes spent a large portion of his day in class with his students, where he taught, monitored students to prevent conduct contrary to the students' individual treatment plans, and performed behavioral observations of each student to determine the progress of that treatment.  Using this information, Mr. Haynes participated in team meetings with other C.I.T.Y. staff in which each student's behavior would be discussed and analyzed, and assisted in the development of individualized treatment plans.  Mr. Haynes would then implement the treatment plans while in class.

Also, since joining Three Springs in August 1991 as Director of Education, Mr. Haynes had gained a good deal of experience both in the substantive treatment of adolescent sexual disorders and in the implementation of federal and industry standards for treatment centers like Courtland.  The latter fact was particularly important, since most insurers will not cover the cost of treatment at facilities that are not

sanctioned by the industry oversight group known as the Joint Commission on the Accreditation of Health Organizations, and 55% of Courtland's residents at that time were insured.  As a result of this review of Mr. Haynes' background and performance, I believed (as did Dr. Cook) that he was the best candidate for the job.

Mr. Carter was considered for the Program Director job; however, he did not equal Mr. Haynes either in his clinical experience before coming to Courtland or his clinical experience since I hired in 1990. In addition, Mr. Carter did not possess a number of special skills and knowledge required for the job and listed in the Program Director job description Dr. Cook and I used to fill the position.  At no time did Mr. Carter's race or age come up in my conversations with Dr. Cook regarding the Program Director opening, and Mr. Carter's race and age played no role whatsoever in my determination that Mr. Carter was not qualified for the job or my determination that Mr. Haynes was the most qualified candidate for the job.

/s/ Beverly McLemore
BEVERLY MCLEMORE

Sworn to and subscribed before me this 14 Day of November, 1996.

/s/ Alice B. Wales
NOTARY PUBLIC

My commission expires: Jan. 8, 1997

## ATTACHED RESUME OF GREGORY W. HAYNES' QUALIFICATIONS

HOME ADDRESS:       105 W. Canal St.
                    Demopolis, Al. 36732

TELEPHONE:          (205)289-8346  (205)295-5743

EDUCATIONAL RECORD:

Presently:          I am working on a M.Ed. in Guidance Counseling at Livingston University.

August 1990:        M.A.T. in Social Science in Secondary Education.

November 1981:      Bachelor of Science in Secondary Education - Composite Major:  Social Science, 90
                    hours, Livingston University, Livingston, Al.

37

EMPLOYMENT HISTORY:
FULL TIME:

August 1990
to Present:            Graduate Student and Social Studies teacher at Demopolis Academy, Demopolis, Al.

October 1989
to March 1990:         Educational Coordinator
                       C.I.T.Y. Program of Tuscaloosa County

                       Responsible for testing all students enrolled in the program. Evaluate test results
                       and help student plan academic goal. Write students Reading, Subject Credits, and
                       G.E.D. related material. Coordinate student's placement in school. Supervise
                       entire academic program including a teacher and teacher's aide.

October 1988
to September 1989:     Classroom Instructor
                       C.I.T.Y. Program of Tuscaloosa County

                       Responsible for the monitoring, instructing, and testing of thirty students referred
                       to the Program by the Juvenile Court. Developed instructional material to
                       supplement PACE Material used in the classroom. Provide monthly academic
                       reports; assist in administering and scoring academic diagnostic test; assist in
                       behavioral observations of each enrolee to identify negative and positive behaviors;
                       to help students obtain their academic goal while at the C.I.T.Y. Program.

Court Note:  Attached to Ms. McLemore's Affidavit are Exhibit "A" [ORGANIZATIONAL CHART -
reproduced *ante* p. 4]; Exhibit "B" [Resume of Charles Lester Carter, reproduced *ante* pp. 14-16] and
Exhibit "C" [Resume of Gregory W. Haynes' Qualifications prior to his employment at Courtland RTC
1990]. This resume was inserted verbatim by the Court following the presentation of the Beverly McLemore
Affidavit *ante* pp. 37-38.


THREE SPRINGS RESIDENTIAL TREATMENT CENTER PERSONNEL
POLICY/PROCEDURE STATEMENT, PLAINTIFF'S EXHIBIT NO. 1 TO
DEPOSITION OF DR. PAM COOK

POLICY:

It is the policy of Three Springs, Inc., to provide opportunity for
promotion and when possible to promote from within whenever
internal applicants meet job qualifications, skills, abilities, and
experience requirements.

PROCEDURES:

Employees may apply for any position for which he/she is qualified
as it becomes available within Three Springs, Inc. Applicants will
be considered based solely upon qualifications (education,
experience, skills, and abilities). Promotion will be made with

38

due consideration for internal applicants.

Internal applicants shall be requested to release a copy of their last performance evaluation and current supervisor's recommendation during the interviewing/screening process.

When an employee is promoted - a new annual performance evaluation date is established on the date of promotion for that employee (this shall be the employees new anniversary date).

If an employee wishes to make a lateral move (Job Description will not change) within the program or to another program - an agreement will be established between interested parties (I.3. employee, supervisor, Program Administrator) as to terms of the move.

1.  Staff will receive promotions based upon job performance and qualifications.

2.  Staff may be moved to higher level positions within their own classifications based upon job performance and evaluations.

3.  Consideration for promotion can be made: 1) upon the creation of a higher level position within the staff's classification; or 2) at the time of performance appraisal.

4.  If more than one staff member qualifies for the same position, the promotion decision will be based upon (in this order): 1) job performance in existing role; 2) seniority within the job classification; 3) seniority within the organization.

5.  All open positions will be announced internally by posting the position on the staff bulletin board in order for employees to be aware of, and apply for, positions for which they are qualified.

It is a relevant, material undisputed fact in this summary judgment proceeding that the Defendant Three Springs Residential Treatment Center DID NOT announce the open position of PROGRAM DIRECTOR at its Courtland RTC facility [by posting notice of such vacancy internally or otherwise] which became an open position in January 1993 when the Courtland RTC Program Director BRENDA BAIRD

resigned. **Moreover, this Defendant candidly admits in brief in this summary judgment proceeding that its policy at that time was to post vacancies internally and externally (i.e., in-house and in outside media)** and that it was the prime responsibility of Dr. Pam Cook in her then capacity as acting Program Director at Courtland RTC to see that such policy was complied with.

However, it is also a relevant, material undisputed fact in this summary judgment proceeding that THE FACT that Ms. Brenda Baird had resigned as Program Director of the Three Springs Residential Treatment Center at Courtland, Alabama in January 1993, thus creating a vacancy in that Courtland RTC top tier position which had to be filled was then widely known throughout the Courtland RTC staff, specifically including Plaintiff Charles L. Carter who was then employed at Courtland RTC as a SHIFT SUPERVISOR of employees working as Counselor Aide, Counselor Aide II, Counselor I and Counselor II, all very low tier, low level positions on Courtland RTC staff, as was Mr. Carter's position of Shift Supervisor.

This summary judgment evidentiary record shows without conflict or dispute that in practice the Defendant's policy of posting vacancies internally and externally (in-house and in outside media) was often overlooked; in fact, both Dr. Pam Cook and Beverly McLemore were promoted into positions which were not posted. McLemore Deposition at pp. 10: 25-11; 10; 15:11-15, 18. Plaintiff Carter himself was promoted at Courtland RTC on three occasions before January 1993 into unposted positions.

40

Furthermore, Plaintiff had not expressed any interest in advancement at Courtland RTC on two of those three occasions. Finally, it is undisputed that the non-posting in January 1993 with respect to the Program Director position vacancy at Courtland RTC had an equal effect on all potential candidates, whether Caucasian or Afro-American or otherwise.

While able counsel of record for Plaintiff Charles L. Carter strongly suggests and strenuously argues that the admitted non-posting of the Program Director position vacancy at Courtland RTC in January 1993 was either a racial discrimination practice on the part of the corporate Defendant or was deliberately done and designed by Dr. Pam Cook and Beverly McLemore to conceal some racially discriminatory motive to deprive Mr. Carter of his inalienable rights, this United States District Court expressly declines to so hold, being thoroughly persuaded and expressly finding that the corporate Defendant's failure to post notice of the position vacancy in question was the result of no more than unintentional simple negligence with no intention to deprive this Plaintiff of the opportunity of seeking employment in such position and that Plaintiff Charles L. Carter was not injured or damaged in any way whatever, either actually or via legal theory, by this non-posting about which his counsel of record makes much ado about very little. This summary judgment evidentiary record shows that Plaintiff Carter was timely considered by Dr. Pam Cook and by Beverly McLemore along with every other employee at Courtland RTC who held a master's degree. Cook at 130: 23-131-2; 147:10-14.

41

McLemore at 22:22-23-9. Posting of the vacancy would have given Mr. Carter no consideration for the position of Program Director at Courtland RTC he and the other eligibles did not otherwise receive from Dr. Cook and Ms. McLemore. Moreover, the non-posting of this vacancy in January 1993 which admittedly occurred cannot transform Mr. Carter from his status as a person clearly and obviously not qualified in January 1993 for the position of Program Director at Courtland RTC on the basis of the relevant, material, undisputed evidence in this SJ evidentiary record into a person acceptably qualified in the eyes of the law for that position **by legal presumption** which cannot successfully operate this Courtland, Alabama facility.[6]  In short, this Court expressly finds and holds from all of the SJ evidence introduced both in support of and in opposition to summary judgment in this case that in January 1993 Plaintiff Charles L. Carter **was not** qualified to hold the position of Program Director of Courtland RTC.  Moreover, there is no genuine issue of material fact in this summary judgment evidentiary record with respect to the issue of Mr. Carter's qualification for this top level executive position at the Three Springs Residential Treatment Center in Courtland, Alabama.  He simply was not and is not qualified for the position and Dr. Pam Cook and Beverly McLemore, the Courtland RTC decision-makers in this case, correctly

---

[6] Plaintiff even claims and testified under oath when his deposition was taken on July 1, 1996 by the Defendant that he was more qualified for the position of Program Director than Dr. Cook insofar as experience was concerned.  Plaintiff at p. 254:5-21.  See also Plaintiff at pp. 256-258.  There is no summary judgment fact in the summary judgment evidentiary record which supports Plaintiff's grossly exaggerated and completely unfounded claim.

and properly so found and determined.   Furthermore, this Court
finds from this SJ evidentiary record and expressly holds that Mr.
Carter's Afro-American race was not a factor and played no part
whatever in the January 1993 Cook-McLemore decision that Greg
Haynes was qualified for the position of PROGRAM DIRECTOR and that
Mr. Carter was not.   This Court here and now makes the factual
finding from the SJ evidentiary record in the above-entitled civil
action that there is no genuine issue of material fact in this
summary judgment proceeding with respect to the issue of which of
these two male employees of Courtland RTC was better qualified for
the position of Program Director at Courtland RTC in January 1993
for the plain and simple reason that the undisputed, relevant,
material summary judgment facts in this case conclusively show that
Greg Haynes **was qualified** for such position and that Charles L.
Carter **was not.**

> DR. PAM COOK AND MS. BEVERLY McLEMORE WERE
> BOTH   WELL   QUALIFIED   TO   SERVE   AS   THE
> DEFENDANT'S JANUARY 1993 HIGHLY EXPERIENCED,
> WELL TRAINED AND IMPARTIAL DECISION-MAKERS IN
> THE SELECTION OF THE NEW PROGRAM DIRECTOR AT
> COURTLAND RTC ABOUT WHICH PLAINTIFF COMPLAINS
> IN THIS CASE.

Dr. Pam Cook, a white female, was 33 years of age in January
1993 when the Courtland RTC Program Director employment decision
was made which Plaintiff Charles L. Carter challenges in this case
as being the product of intentional and prohibited racial
discrimination against him because he was and is an Afro-American
male.   Dr. Cook was employed as Program Director at Courtland RTC

43

in October 1990 and served in this facility in such position until November 1992 when she was promoted to the Courtland RTC position of Administrator when Ms. McLemore at such time was promoted to the position of Director of Operations from her position as Courtland RTC Administrator.

Dr. Cook at the time of this challenged decision had earned her Ph.D. in applied behavioral studies and had almost 10 years experience working in the mental health field.

Beverly McLemore, a white male and the other decision-maker in this challenged employment decision, was 43 years of age in January 1993. She then had earned a master's degree in clinical social work and had 20 years experience working in various mental health facilities. She commenced her employment at Courtland RTC in October 1989.

In September 1990 **Ms. McLemore** hired Plaintiff Charles L. Carter to work at the Courtland RTC facility as a part-time Counselor Aide.[7] In January 1991, along with Dr. Pam Cook [who at that time was the Courtland RTC Program Director], Ms. McLemore promoted Mr. Carter to the full time position of Counselor at the Courtland RTC facility.[8] In May 1992 Ms. McLemore promoted Charles L. Carter to the Courtland RTC position of Counselor II, again in conjunction with Dr. Cook.[9] Again in September 1992 after working

---

[7] Apparently Plaintiff gives Ms. McLemore no credit for employing him in this entry level position at Courtland RC.

[8] Again Mr. Carter gives Dr. Cook and Ms. McLemore no credit for this promotion.

[9] No credit given either of these white females by Mr. Carter.

44

in the position of Counselor II for approximately 4 months, Mr. Carter was appointed to the role of Shift Supervisor at Courtland RTC in which he supervised the activities of other Courtland RTC counselors. Dr. Cook and Ms. McLemore were jointly responsible for this promotion of Mr. Carter as well.[10]

In January 1993 at a time when Plaintiff Carter still held his Shift Supervisor position at the Three Springs Courtland, Alabama facility he was conscientiously considered and carefully evaluated for the Courtland RTC position of PROGRAM DIRECTOR jointly by Dr. Cook and Ms. McLemore on their own volition and jointly determined by them to be not qualified to fill the Program Director position in question.    And this Senior United States District Judge on careful review and consideration of this entire summary judgment evidentiary record expressly finds, determines and holds that there are    no    relevant,    material    facts    in    this    summary    judgment evidentiary record presented by the Summary Judgment Adverse Party [Plaintiff] or otherwise which directly or circumstantially show or suggest or infer that Dr. Cook's and Ms. McLemore's "not qualified" joint determination with respect to Mr. Carter as a possible candidate for the position of Program Director of Courtland RTC was directly or indirectly influenced by or predicated on racial hostility or racial bias against Mr. Carter because of his race [black] on the part of these thoroughly experienced, well educated, well trained and highly knowledgeable Courtland RTC decision-makers

---

[10] No credit given by Mr. Carter to these Courtland RTC executives.

45

or on the part of either one of them.[11]

In making the foregoing described finding, determination and holding and long before writing this MEMORANDUM OPINION, this federal district court has been fully and keenly aware of PLAINTIFF'S MOTION IN OPPOSITION TO SUMMARY JUDGMENT filed in the Office of the Clerk of this Court and in this case on January 3, 1997 and with Plaintiff's contemporaneous submission therewith of the following "evidentiary items" on which Plaintiff in substantial part bases his contention and assertion in this case **"that there are genuine issues for trial and that summary judgment is controverted and inappropriate in this case."**

### PLAINTIFF'S EVIDENTIARY ITEMS SUBMITTED IN OPPOSITION TO SUMMARY JUDGMENT

TAB 1:     Affidavit of <u>Tyrone Bowling</u>, black male employee of Courtland RTC, who was employed in the non-clinical, low level position of Counselor Aide for less than 1 year in 1993. During this time frame Mr. Bowling was employed in a position subordinate to the Courtland RTC position then held by Charles L. Carter but both were in a non-clinical category.

TAB 2:     Affidavit of <u>Gregory Jones</u>, black male employee of Courtland RTC, who was employed in several non-clinical, low level positions: Counselor Aide from 4/7/91 to 11/1/92; Shift Supervisor in 12/92 [Counselor low tier level]; Counselor II on 4/5/93; and as Activity Therapist which is one tier level above the COUNSELOR group. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 3:     Affidavit of <u>Rudolph Nails</u>, black male employee of Courtland RTC, who was employed in the non-clinical, low level position of Counselor Aide from 2/91 through 7/91.

---

[11] The Court here notes that it has this date fully granted Defendant's MOTION TO STRIKE certain designated portions of each of the 10 summary judgment AFFIDAVITS of certain male and female Afro-Americans.

46

His last Courtland RTC employment date is shown to be at least 18 months prior to Plaintiff Carter's non-selection as Program Director in January 1993. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 4:   Affidavit of <u>Margarett Allen</u>, a black female former employee of Courtland RTC who worked from May 1991 through August 1991, a period of four months, as Education Director of the Courtland RTC facility. Her last Courtland RTC employment date is shown to be at least 17 months prior to Plaintiff's non-selection as Program Director in January 1993. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 5:   Affidavit of <u>Samuel Brewer</u>, a black male former employee of Courtland RTC who worked as a Counselor Aide, a non-clinical, low level position from 6/92 through 8/92, less than 3 months. His last Courtland RTC employment date is shown to be at least 6 months prior to Plaintiff's non-selection as Program Director in January 1993. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 6:   Affidavit of <u>Arlene Hall</u>, a black female former employee of Courtland RTC who worked as an LPN in the Nurses Group at Courtland RTC on two occasions within the past 5 years, less than a full year in each employment period. She was apparently a supervisor of Plaintiff Charles L. Carter during her first Courtland RTC working period. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 7:   Affidavit of <u>Tina J. Carter</u>, a black female former employee of Courtland RTC who worked as the LPN in charge in the Nurses Group at Courtland RTC from 6/90 to 9/91 and was Plaintiff's supervisor when he worked part-time at Courtland RTC as a Counselor Aide in 1990. Her last Courtland RTC employment date is shown to be at least 15 months prior to Plaintiff's non-selection as Program Director in January 1993. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 8:   Affidavit of <u>Ronnie Johnson</u>, a black male former employee of Courtland RTC who worked as Counselor Aide, a non-clinical, low level position, from 8/90 to 1/91. His last Courtland RTC employment date is shown to be at least 11 months prior to Plaintiff's non-selection as Program Director in January 1993. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 9:   Affidavit of <u>Annie M. Cobb</u>, a black female former employee of Courtland RTC who worked as an LPN and Shift Supervisor in the Nurses Group during the 1/90 through

47

5/93 time frame. The last position held by Ms. Cobb at Courtland RTC [time frame not identified] was Assistant Director of Nursing at which time she occupied a supervisory position over Plaintiff Charles L. Carter whose entire employment at Courtland RTC was in the non-clinical, low level position of Counselor Aide, Counselor I, Counselor II and Shift Supervisor of other counselors. See ORGANIZATIONAL CHART *ante* p. 4.

TAB 10:    Affidavit of Marion Mims, a black female former employee of Courtland RTC who worked for this Defendant in the non-clinical, low level position of Counselor II from 1992 through 1994 and who may have served as a Courtland RTC worker in its Education Program during certain summer months of her above-identified employment period. At some time during her Courtland RTC employment Plaintiff Charles L. Carter was employed there as a Counselor Aide, a non-clinical position at Courtland RTC previously identified.

*Court Note*:    See, infra, commencing at p. 72 for Plaintiff's additional evidentiary items submitted in opposition to summary judgment.

PLAINTIFF'S AFFIDAVITS OF SUMMARY JUDGMENT AFFIANTS BOWLING, JONES, NAILS, ALLEN, BREWER, HALL, TINA J. CARTER, JOHNSON, COBB AND MIMS REVISITED TO EVIDENCE PORTIONS OF EACH AFFIDAVIT TO WHICH DEFENDANT THREE SPRINGS RESIDENTIAL TREATMENT CENTER DIRECTED MOTION TO STRIKE FILED JANUARY 8, 1997 AND TO FURTHER EVIDENCE DEFENDANT'S ASSIGNED GROUNDS OF AUTHORITY THEREFOR.

## AFFIDAVIT OF TYRONE BOWLING
[Counselor Aide Subordinate To Carter]

## Defendant's Motion To Strike:

I was employed in the position of Counselor Aide. Mr. Carter was my supervisor and I noted that he did an excellent job with respect to his work at Three Springs, and further, that Mr. Carter was one of the best workers that Three Springs had at its facility.

## Cited Authority:

Bowling's statements related to Carter's performance as a counselor are irrelevant as Carter's performance of that position is not at issue in this case. In addition, Bowling lacks personal knowledge in the proper foundation for his opinion that "Carter was

one of the best workers that Three Springs had at its facility."
F.R.E. 602 and 701.

**Defendant's Motion To Strike:**

> I had a problem with respect to Ms. Cook in that there was an incident in which I was disciplined as a result of my talking with one of the adolescents about religion. This led to my termination, but a similarly situated white employee who engaged in the same contact was not disciplined in any fashion.

**Cited Authority:**

Bowling's statements are conclusory and lacking in specific facts (i.e., time of the alleged incident, name of white employee, name of decision-maker, etc.). These raw assertions do not tend to make the existence of any fact that is of consequence to the determination of this action more probable or less probable than it would be without the evidence and are, therefore, irrelevant. In addition, Bowling has failed to establish that he has personal knowledge for his assertions that "a similarly situated white employee who engaged in similar conduct was not disciplined in any fashion." See F.R.E. 602. As a result, this portion of the affidavit is due to be stricken.

**Defendant's Motion To Strike:**

> I also noted during my tenure that the black staff members at the Three Springs Courtland facility were given more severe punishment for offenses while they were employed than that given to white employees.

**Cited Authority:**

These statements are once again conclusory allegations lacking in specific facts (i.e., time, names of employees allegedly

punished more or less severely, decision-maker, etc.). Bowling has again failed to establish that he has personal knowledge for his assertions. See F.R.E. 602. Likewise, Bowling has not established a foundation for his qualifications to offer what amounts to opinion testimony concerning an alleged disparity and punishment between black and white staff members. F.R.E. 701. Specifically, Bowling has failed to assert the facts necessary to establish that his opinions are rationally based on his perception and that these opinions are helpful to the determination of a fact in issue. As a result, this portion of the affidavit should be stricken by the Court.

## Defendant's Motion To Strike:

> Also during this time Greg Hanes was working as Program Director and I found that Mr. Hanes [sic] was not effective in his position and was not able to effectively handle the management of the staff by his _____ reactions and harsh treatment to black staff members.

## Cited Authority:

This portion of the affidavit contains conclusory allegations which are irrelevant to the case. Whether Bowling felt that Haynes was an effective Program Director is irrelevant to the question at hand. In addition, Bowling has not shown that he has personal knowledge for his opinions regarding Mr. Haynes' alleged treatment of black staff members nor has Bowling offered any facts to support his assertions. As a result, this portion of the affidavit is not admissible pursuant to F.R.E. 402, F.R.E. 602, and F.R.E. 701.

## AFFIDAVIT OF GREGORY JONES
[Activity Specialist]

### Defendant's Motion To Strike:

> I noted that Mr. Carter always did his job with respect to the documentation and paperwork required for his position. I never heard anyone make any critical comments about the job performance of Mr. Carter.

### Cited Authority:

Jones' statements related to Carter's performance as a Counselor II are irrelevant as Carter's performance of that position is not at issue in this case. See F.R.E. 401 and 402. In addition, Jones has failed to show that he has the required personal knowledge of his assertion that "Carter always did his job." F.R.E. 602. In addition, whether Jones ever heard any critical comments about Carter's performance is irrelevant to this case because Jones' affidavit does not provide facts which tend to show he would have heard any such comments. See F.R.C. 401 and 402.

### Defendant's Motion To Strike:

> I was involved in an incident involving a written reprimand for a situation dealing with the escape of one of the adolescents, but a white employee, who also had the same offense, was not provided any written reprimand. Based upon the period of time that I worked with Three Springs, specifically with the management of the Three Springs facility, it was my observation that this was a racially hostile environment as related to minority employees.

### Cited Authority:

Jones' statements are conclusory, lacking in specific facts (i.e., time of alleged incident, name of white employee, name of decision-maker, etc.), and are irrelevant. Jones has failed to establish that he has a proper foundation, including personal knowledge, for his assertions of a "racially hostile environment"

51

or that he is qualified to render such an opinion.  See F.R.E. 602 and 701.  Likewise, Greg has failed to assert the facts necessary to establish that his opinions are rationally based on his perception and that these opinions are helpful in determining a fact at issue.  As a result, this portion of the affidavit is due to be stricken.

**Defendant's Motion To Strike:**

> Further, during the time I worked there, I noted that Greg Hanes [sic] was not effective supervising his personnel when he was hired as Program Director.

**Cited Authority:**

This portion of the affidavit contains conclusory allegations which are irrelevant to the case.  Whether Jones felt that Haynes was effective in supervising his personnel is irrelevant to the question at hand.  F.R.E. 401 and 402.  Jones failed to establish that he has a proper foundation to support his assertion that he had personal knowledge, or any other basis, to assess Haynes' performance at any time.  F.R.E. 602.

### AFFIDAVIT OF RUDOLPH NAILS
[Counselor Aide]

**Defendant's Motion To Strike:**

> I consider Mr. Carter as having done a very good job with respect to his work performance. I specifically noted that Mr. Carter worked to help bring college-educated staff into positions at the facility of Three Springs in Courtland.

**Cited Authority:**

Nails' statements relating to Carter's work performance as a Counselor are irrelevant as the performance of that position is not at issue.  See F.R.E. 401 and 402.

52

**Defendant's Motion To Strike:**

> During the time I was employed, I noted that there was a racially biased attitude by management towards minority black employees. I noted, specifically, a difference in the rate of pay between minority member employees and others. I also noted that black minority employees were not promoted or offered promotions as were other employees, and that management tended to ignore the opinions and recommendations from the black minority employees.

**Cited Authority:**

These statements are once again conclusory allegations lacking in specific facts (i.e., time, names of employees allegedly punished more or less severely, decision-maker, etc.). Nails has again failed to establish that he has personal knowledge for his assertions. See F.R.E. 602. Likewise, Nails has not established a foundation for his qualifications to offer what amounts to opinion testimony concerning an alleged disparity in punishment and pay between black and white staff members. F.R.E. 701. Specifically, Nails has failed to assert the facts necessary to establish that his opinions are rationally based on his perception and that these opinions are rationally based on his perception and that these opinions are helpful to the determination of a fact in issue. As a result, this portion of the affidavit should be stricken by the Court.

### AFFIDAVIT OF MARGARETT ALLEN
[Director of Education, May 1991 - August 1991]

**Defendant's Motion To Strike:**

> During that time I had some interaction with Charles Carter and found that he did a good job with respect to his positions with Three Springs. I also noted that Mr. Carter was responsible for the

53

night-time education program and he developed various programs for Three Springs at this facility to support the job that he did.

## Cited Authority:

Ms. Allen's statements relating to Carter's performance as a counselor and her opinion that he did a "good job" with respect to his position as counselor are irrelevant.  See F.R.E. 401 and 402.

## Defendant's Motion To Strike:

During the time I worked at Three Springs, I reported directly to Pam Cook, who was then Program Director. Pam Cook admitted to me that she had difficulty in understanding Afro-Americans, and that further, her experience and interaction up to this time had been minimal with respect to black employees, and that Ms. Cook identified a bias against blacks and she found that they were difficult for her to trust or get along with.

## Cited Authority:

These statements are apparently offered in an effort to establish that Ms. Cook is biased against blacks.  However, these statements are little more than conclusory allegations lacking in specific facts.  Plaintiff does not indicate when these statements were allegedly made, the context in which the statements were allegedly made, or the actual statements themselves.  Rather, Allen simply makes assertions and reaches opinions regarding what she perceives to be a bias on the part of Cook.  In addition, these statements constitute inadmissible hearsay under Federal Rule of Evidence 801 as they are obviously being offered for the truth of the matter asserted.

Furthermore, these statements do not constitute direct evidence that Plaintiff was denied the promotion to Program Director in January 1993 because of his race.  Evidence is direct when it is sufficient to prove discrimination without inference or

presumption. Carter v. City of Miami, 870 F.2d 578, 581-82 (11th. Cir. 1989). Only the most blatant remarks whose intent could be nothing other than to discriminate direct evidence. Id. at 582; Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993). None of these alleged statements, if true, rise to the level of direct evidence.

The Eleventh Circuit has adopted Justice O'Connor's definition of direct evidence. See Trotter v. Bd. of Trustees of the Univ. of Alabama, 91 F.3d 1449 (11th Cir. 1996); EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990). Justice O'Connor's opinion in Price Waterhouse emphasized that "statements by nondecision makers, or statements by decision makers unrelated to the decision process itself" are not direct evidence. See Price Waterhouse, 490 U.S. at 277 (O'Connor, J. concurring). The Eleventh Circuit, along with most of the other circuits, has adopted this narrow view of what constitutes direct evidence. See Trotter v. Bd. of Trustees of the Univ. of Alabama, 91 F.3d 1449 (11th Cir. 1996); Clark v. Coates & Clark, Inc., 995 F.2d 1217, 1223 (11th Cir. 1993) ("Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence."); EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990); Tomsic v. State Farm Mut. Auto. Ins. Co., 85 F.3d 1472, 1477-78 (10th Cir. 1996) (statements of personal opinion by supervisor about married woman's motivation to work were not direct evidence); Kriss v. Sprint Communications Co., 58 F.3d 1276, 1282 (8th Cir. 1995) (adopting Justice O'Connor's definition of direct

evidence); O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-49 (4th Cir. 1995) ("Unless the remark on which plaintiff relies were related to the employment decision in question, they cannot be evidence of discriminatory discharge.") Gagne v. Northwestern Nat.'l. Ins. Co., 881 F.2d 309, 314 (6th Cir. 1989) ("isolated and ambiguous statements" even when made by decision maker, did not constitute direct evidence).

According to the affiant, Cook's alleged statements would have to have been made prior to August, 1991 (Allen's last date of employment at Three Springs), and were not related in any way to her decision not to promote the Plaintiff in January 1993.[1] Since "statements by decision makers unrelated to the decisional process itself" are not direct evidence, Cook's alleged statements cannot satisfy Plaintiff's burden of making out a prima facie case. Comments by a supervisor that are temporally remote from the challenged decision can hardly be direct evidence of discrimination since they require an inference of a general discriminatory attitude, followed by another inference that the attitude entered into the making of the challenged decision. Allen v. City of Athens, 937 F.Supp. 1531, 1996 U.S. Dist. LEXIS 12859, *38 (N.D. Ala. 1996) (citing Armbruster v. Unisys Corp., 32 F.3d 768, 779 (3rd Cir. 1994)). Here, the remarks were both temporally remote

[1] In addition, Cook promoted Plaintiff on two separate occasions after allegedly making these remarks. Plaintiff has chosen to simply ignore this fact as it destroys the inference Plaintiff seeks to create.

56

and were wholly unrelated to either the decision not to promote Plaintiff or to the general promotion standards and policies Defendant had developed for choosing Program Directors.   The evidence does not even indicate that Cook's comments were made with regard to work.   Thus, they cannot constitute direct evidence.   Id.

Plaintiff has produced, at best, only "stray remarks in the workplace," "[alleged] statements by decision makers unrelated to the decision process itself."   Price Waterhouse v. Hopkins, 490 U.S. 228, 227 (1989) (O'Connor, J. concurring).   These statements do not "justify requiring the employer to prove that its hiring and promotion decisions were based on legitimate criteria."   Id.   There is no credible evidence in this case that Defendant ever addressed any racial or derogatory remarks to Plaintiff or any of its employees and no such statements "related to the selection of an employee for a particular position."   Aikens v. Bolger, 33 F.E.P. 1697, 1699 (D.D.C. 1984) aff'd mem., 57 F.E.P.C. (B.N.A.) 1896 (1985).   The alleged direct evidence relied upon by Plaintiff, even if accepted as true, was "unrelated to the decisional process" and, therefore, is insufficient to demonstrate that the employer relied on illegitimate criteria in making promotion decisions.   Smith v. Firestone Tire & Rubber Co., 879 F.2d 11 1325, 1330 (7th Cir. 1989); see, e.g., Caster v. Sangamo Weston, Inc., 837 F.2d 1550, 1553 & 1558 (11th Cir. 1988); Barber v. Int'l. Bhd. of Boilermakers, 778 F.2d 750, 761 (11th Cir. 1985) (holding that statement by employer that Plaintiff was "a smart ass nigger" did not carry Plaintiff's "ultimate burden of proof" since the

57

statement was unrelated to the referral practice at issue." The probative value of the alleged racial statements simply is too attenuated to be of legal significance. Young v. General Foods Corp., 840 F.2d 825, 829 (11th Cir. 1988), cert. denied, 488 U.S. 1004, 102 L.Ed 2d 774, 109 S.Ct. 782 (1989).

## Defendant's Motion To Strike:

During that time I observed that Mr. Carter did a very good job and was one of the best at dealing with his particular job at the Three Springs facility and that Mr. Carter had an excellent manner in dealing with the troubled adolescents. I also noted that Mr. Carter adequately handled the vocabulary that was necessary in order to interact with other employees. I noted nor heard of any job inadequacies on the part of Mr. Carter.

## Cited Authority:

Allen's statements relating to Carter's job performance as a Counselor and her opinions that he did a "good job" as Counselor are irrelevant to this case. Whether Carter was able to handle the vocabulary necessary for the job of counselor is irrelevant and Allen has failed to show that she has the requisite personal knowledge or foundation to render opinions as to his ability to handle the vocabulary requirement of Program Director. F.R.E. 401 and 402.

## AFFIDAVIT OF SAMUEL BREWER

[Counselor Aide]

## Defendant's Motion To Strike:

While employed at the Avalon Middle School, Mr. Carter had principalship experience dealing with problem adolescents and special-needs children. The problems that were encountered at the Avalon Middle School were similar to the problems of the patients at the Three Springs Facility. While Mr. Carter was employed as principal of the Avalon Middle School he had primary administrative responsibility for the oversight of the entire school, including all the problem adolescents.

58

**Cited Authority:**

Brewer has failed to establish that he has the requisite personal knowledge and foundation for his opinion that the problems encountered at the Avalon Middle School were similar to the problems of the patients at the Three Springs facility. In addition, Mr. Brewer's affidavit testimony is in contradiction with Mr. Carter's deposition testimony where Carter extensively testified as to the specific job duties he performed while at Avalon Middle School and did not testify that he dealt with any sexually disturbed children. Furthermore, Brewer has failed to establish that he has any personal knowledge and understanding of the nature of the problems suffered by the residents of Three Springs.

Court Note: The BACKGROUND SECTION of the February 5, 1982 Opinion of the Eleventh Circuit Court of Appeals presented *ante* p. 18 flatly refutes that part of the AFFIDAVIT of Samuel Brewer which states that while Mr. Carter was employed as principal of the Avalon Middle School he had primary administrative responsibility for the oversight of the entire school, including all of the problem adolescents. Mr. Carter was not Administrative Principal of Avalon Middle School.

Defendant's Motion To Strike:

> I also had conversations with Greg Hanes [sic] from which I learned that Mr. Hanes [sic] had limited prior experience dealing with special -needs children and adolescents. Based upon my conversations with Mr. Hanes and my personal experience in working with Charles Carter, it is my opinion that Mr. Carter was better qualified by experience for the position of Program Director at the Three Springs Facility in Courtland.

**Cited Authority:**

Once again, Brewer is making conclusory allegations and offering inadmissible opinion testimony. Specifically, Brewer has not established that he has the proper foundation, including personal knowledge, or the qualifications to offer the opinion that Mr. Carter was better qualified by experience for the position of

Program Director.   Likewise, Brewer's statements concerning his
conversations with Mr. Haynes constitute inadmissible hearsay under
F.R.E. 801.   More importantly, Mr. Brewer's assessment that Carter
was more qualified is not sufficient to create a material issue of
fact.   As courts have consistently recognized, "general averments
of adequate performance by [the plaintiff] or a coworker are
ordinarily insufficient to create a factual issue on summary
judgment."   Sirvidas v. Commonwealth Edison Co., 60 F.3d 375, 387
(7th Cir. 19995); Dale v. Chicago Tribune, 797 F.2d 458, 462-65
(7th Cir. 1986) (Plaintiff "must do more than challenge the
judgment of his superiors through his own self interested
assertions.   [The Plaintiff's] perception of himself . . . is not
relevant.   It is the perception of the decision-maker which is
relevant.")   cert. denied, 479 U.S. 1066 (1987).

**Defendant's Motion To Strike:**

> During my employment at Three Springs, I felt, as an Afro-American employee, that there
> was a racially hostile environment created by Pam Cook towards minority employees of the
> Facility. During my employment, I was also aware that both Mr. Carter and I maintained
> "AA" educational certificates and that we were paid less in our positions than other non-
> minorities who had lesser educational degrees.

**Cited Authority:**

These statements are again conclusory allegations lacking in
specific facts.   Brewer has once again failed to establish what
personal knowledge he has for his assertions.   See F.R.E. 602.
Brewer has not indicated any facts which support his assertion of
a "racially hostile environment created by Pam Cook."   Likewise,
Brewer has not established a foundation or qualifications to offer
opinion testimony about a "hostile environment" pursuant to F.R.E.

60

701.  In addition, Brewer has also failed to establish that he has
the requisite personal knowledge for his assertion that minorities
were "paid less" and Brewer offers absolutely no facts to support
this assertion.

### AFFIDAVIT OF ARLENE HALL

[Nurse]

### Defendant's Motion To Strike:

> I had no complaints with his job performance.  Further, Mr. Carter handled all of his
> paperwork and documentation as required by company policy.  Mr. Carter exhibited a very
> good manner with the kids and was able to deal with them in difficult situations.  Mr. Carter
> also exhibited familiarity with the words and terminology which were necessary for his job.
> I have the highest regard for the work that was done by Mr. Carter.

### Cited Authority:

Hall's statements relating to Carter's job performance as a
Counselor are irrelevant and not at issue in this case.
Furthermore, whether Carter exhibited familiarity with the words
and terminology "necessary for his job" as a Counselor are not
probative of his qualifications for the position of Program
Director.

### Defendant's Motion To Strike:

> I also was aware that management was very complimentary of the job that Mr. Carter did.
> I know of no instances where management complained of anything with regard to Mr.
> Carter's job performance.

### Cited Authority:

This portion of the affidavit is irrelevant pursuant to F.R.E.
402.  Likewise, Hall has failed to establish what, if any, level of
personal knowledge she had regarding complaints about Carter's job
performance.  F.R.E. 602.

**Defendant's Motion To Strike:**

> Based upon my supervision of Mr. Carter, and knowledge of the work that he performed, it was my opinion that Mr. Carter was qualified for the position of Program Director and should have been considered.

**Cited Authority:**

These statements are once again conclusory allegations lacking in specific facts.  Hall has again failed to establish she has personal knowledge for her assertions that Carter was qualified for the position of Program Director.  See F.R.E. 602.  Admittedly, Hall dealt with Carter in the role of Counselor, and Hall has not established a foundation for her qualifications to offer opinion testimony concerning his qualifications for the position of Program Director.  See F.R.E. 701.

## AFFIDAVIT OF TINA J. CARTER

[Nurse]

**Defendant's Motion To Strike:**

> During the time that Mr. Carter worked at the facility, I became aware of his work background and education.  Mr. Carter was more qualified, by education and experience, in his position than any other counselors at this facility.

**Cited Authority:**

This portion of the affidavit contains conclusory allegations which are irrelevant to the case.  Given the lack of foundation, including personal knowledge, and clearly no qualifications, Tina Carter's assertion that Mr. Carter was more qualified than any other Counselor at the facility is completely irrelevant. Furthermore, the individual who received the position, Mr.  Haynes,

was not a Counselor.    This portion of the affidavit is not admissible pursuant to F.R.E. 402, 602 and 701.

### Defendant's Motion To Strike:

> As part of Mr. Carter's job, he was required to prepare progress notes, which included subjective, objective and general assessment of data. He further was involved in the preparation of planning information concerning the patients of the facility. In doing these job functions, he performed on a more than adequate level.

### Cited Authority:

Tina Carter's statements relate only to Carter's performance as a Counselor and are therefore irrelevant as that is not an issue in this case.    See F.R.E. 401 and 402.

### Defendant's Motion To Strike:

> Mr. Carter's job also required him to make verbal presentations in various staff meetings and in other activities. I noted that Mr. Carter had outstanding verbal presentation abilities and that he performed these job functions very well.

### Cited Authority:

This portion of the affidavit again contains conclusory allegations which are irrelevant to the case.    Tina Carter has failed to show that she has a foundation, including personal knowledge, for her opinions that Mr. Carter had "outstanding verbal presentation abilities."    See F.R.E. 602 and 701.    Despite Tina Carter's inadmissible opinion, Mr. Carter's verbal presentation abilities are well documented in his deposition testimony which is a better indicator of his true abilities.

### Defendant's Motion To Strike:

> After my initial employment with Three Springs, I noted a difference in management attitude towards blacks. I also observed that Three Springs took more adverse employment actions against black employees than it took against similarly situated white employees.

63

**Cited Authority:**

Tina Carter has failed to establish that she has a proper foundation, including personal knowledge, for these assertions. See F.R.E. 602. Tina Carter provides no facts to describe this alleged "difference in management attitude towards blacks" nor does she provide any facts concerning these alleged "adverse employment actions" taken against black employees. As a result, this portion of the affidavit is merely conclusory allegations which are inadmissible under the Federal Rules.

**Defendant's Motion To Strike:**

> During my employment, I had the opportunity to have multiple conversations with Pam Cook. During these conversations she indicated to me that her background in Oklahoma was such that she was not around many black people. She indicated to me that she did not understand how to communicate with black people and that she had difficulty in understanding my communications with her. I was given the impressions from her statements that she did not trust black employees at the Courtland facility. I also noted that her attitude and demeanor toads employees were different with black employees than with white employees.

**Cited Authority:**

This portion of the affidavit constitutes inadmissible hearsay under F.R.E. 801 as the purported statements are obviously being offered for the truth of the matter asserted. Tina Carter has failed to establish a proper foundation, specifically a factual basis, for her "impression" that Ms. Cook did not "trust black employees." Likewise, Tina Carter has failed to provide any facts to support her conclusory allegation that Cook's "attitude and demeanor" towards black employees was "different" with black employees, nor does Tina Carter provide any specific examples to support her opinion.

These alleged statements do not constitute direct evidence that Plaintiff was denied the promotion to Program Director in January 1993 because of his race. Carter v City of Miami, 870 F.2d 578, 581-82 (11th Cir 1989) ("Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence"); Clark v. Coates & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993).

According to the affiant, Cook's alleged statements would have to have been made prior to September 1991 (Tina Carter's last date of employment at Three Springs), and were not related in any way to her decision not to promote the Plaintiff in January 1993.[12]

Once again, the alleged remarks were both temporarily remote and were wholly unrelated to either the decision not to promote Plaintiff or to the general promotion standards and policies Defendant had developed for choosing Program Directors. Thus, they cannot constitute direct evidence. Allen v. City of Athens, 937 F.Supp. 1531, 1996 U.S. Dist. LEXIS 12859 *38 (N.D. Ala. 1996) (citing Armbruster v. Unisys Corp., 32 F.3d 768, 779 (3d Cir. 1994).

---

[12] Cook promoted Plaintiff on two separate occasions after allegedly making these remarks.

65

## **AFFIDAVIT OF RONNIE JOHNSON**

[Counselor Aide]

## **Defendant's Motion To Strike**:

> During my employment with Three Springs, I had occasions to be present when Pam Cook addressed several staff members. At that time she indicated that due to her upbringing in the State of Oklahoma, she had a problem relating to black Afro-Americans. She indicated that in the area where she was raised, she did not have a lot o contact with black Americans.

## **Cited Authority**:

These statements again constitute inadmissible hearsay under F.R.E. 801 as they are apparently offered for the truth of the matter asserted.

Once again, these alleged statements do not constitute direct evidence that Plaintiff was denied the promotion to Program Director in January 1993 because of his race. According to the affiant, Cook's alleged statements would have to have been made prior to January 1992 (Johnson's last date of employment at Three Springs), and were not related in any way to her decision not to promote the Plaintiff in January 1993.[13]  Since "statements by decision makers unrelated to the decisional process itself" are not direct evidence, Cook's alleged statements cannot satisfy Plaintiff's burden of making out a prima facie case. Comments by a supervisor that are temporarily remote from the challenged decision can hardly be direct evidence of discrimination since they

---

[13]  Cook promoted Plaintiff after allegedly making these remarks.

require an inference of a general discriminatory attitude, followed by another inference that the attitude entered into the making of the challenged decision.  Allen v. City of Athens, 937 F.Supp. 1531, 1996 U.S. Dist. LEXIS 12859, *38 (N.D. Ala. 1996) (citing Armbruster v. Unisys Corp. 32 F.3d 768, 779 (3d Cir. 1994).  Once again, the alleged remarks were both temporarily remote and were wholly unrelated to either the decision not to promote Plaintiff or to the general promotion standards and policies Defendant had developed for choosing Program Directors.  The evidence does not even indicate that Cook's comments were made with regard to work. Thus, they cannot constitute direct evidence.  Id.

## Defendant's Motion To Strike:

**Also during my period of employment, I noted that the management of the residential treatment facility in Courtland tried to single out blacks more so than whites for disciplinary action.  On at least one occasion I was asked to be involved in the direct monitoring of another black Afro-American employee in order to help assist management in getting information on this black employee so that they could terminate this person.  I refused to get involved in such activities.**

## Cited Authority:

These statements are once again conclusory allegations lacking in specific facts.  Johnson has again failed to establish that he has personal knowledge for his assertions that management at the Courtland facility tried to "single out blacks."  See F.R.E. 602. Johnson has not provided any specific facts related to specific incidents (time, dates, places, names) nor has he identified the

members of management who allegedly engaged in such activity.
Likewise, Johnson has provided no factual basis for his assertions
regarding the attempts by management to allegedly terminate one
black   employee   nor   has   he   established   a   foundation   or
qualifications to offer such opinion testimony pursuant to F.R.E.
701.

**Defendant's Motion To Strike:**

> During my employment at Three Springs at the residential treatment facility in Courtland,
> I noted there was a racially hostile environment as it related to management and various
> employees who worked at the facility.

**Cited Authority:**

Once  again  Johnson  has  failed  to  establish  the  proper
foundation, including personal knowledge, and qualifications for
his opinion that there was a "racially hostile environment."  See
F.R.E. 602 and 701.  Johnson has failed to provide any factual
basis for his assertion and as a result it is merely a conclusory
allegation lacking in specific facts.

## AFFIDAVIT OF ANNIE M. COBB

[LPN and Shift Supervisor]

**Defendant's Motion To Strike:**

> During the time that I supervised Mr. Carter, he was always better than average in the
> performance of his job. He provided good written documentation for his positions. Further,
> I noted that there were no inadequacies in Mr. Carter's job performance in his position. I
> also did not hear any criticisms of Mr. Carter's work during the time I was employed at
> Three Springs.

**Cited Authority:**

Ms.  Cobb's  opinion  regarding  Mr.  Carter's  performance  as  a
Counselor is irrelevant as Carter's performance as counselor is not

at issue.  Cobb has failed to show that she has personal knowledge
for her opinion and that there were no inadequacies in Carter's job
performance.  Furthermore, Cobb has failed to show that she was
even in a position to have heard or been aware of any criticisms of
Carter's performance.  As a result, this portion of the affidavit
is not admissible pursuant to F.R.E. 402, 602 and 701.

**Defendant's Motion To Strike:**

> I was present at staff gatherings during which Pam Cook indicated that she was raised in an
> area where there were not many Afro-Americans, with the result that she felt she had some
> problems dealing with Afro-Americans.  Her initial action was to invite the assistance of
> other minority staff members to help her to understand and to help her be able to deal with
> Afro-Americans.

**Cited Authority:**

These statements contain inadmissible hearsay under F.R.E. 801
as these statements are being offered for the truth of the matter
asserted.  In addition, these alleged statements are irrelevant and
do not constitute direct evidence that Plaintiff was denied the
promotion to Program Director in January 1993 because of his race.
Because the affiant has not indicated the date of the alleged
statements it is impossible to determine the temporal proximity or
the remoteness thereof.  However, it is apparent from the
statements that they were wholly unrelated to either the decision
not to promote Plaintiff or to the general promotion standards and
policies Defendant has developed for choosing Program Director.  As
a result, the evidence cannot constitute direct evidence.

**Defendant's Motion To Strike:**

> Sometime after Pam Cook became administrator, there was a considerable change in her
> attitude.  At that time Pam Cook became less willing to talk with the Afro-Americans on her
> staff as regards to the situations that would be best clarified by the viewpoint of an Afro-

69

American. Also during this time I noted that there appeared to be racism in the hiring,
firing and treatment of Afro-Americans who were employed at Three Springs. I saw that
there was a notable difference in how disciplinary action was handled for a white employee
as opposed to an Afro-American employee, with the Afro-American employee's disciplinary
action being more harsh than a similar situation for a white employee. This disparity
resulted from the management that was in place at the Three Springs Facility.

## Cited Authority:

Cobb has failed to establish that she has the proper
foundation, including personal knowledge, for her assertions and
opinions regarding Ms. Cook.    See F.R.E. 602 and 701.    Cobb
concludes that there were changes and differences in how Cook acted
toward black employees, however, Cobb provides no factual basis for
these raw assertions.    Instead, Cobb simply makes conclusory
allegations against Cook without including a single fact such as
the time, date, place and name of employees allegedly involved in
these "notable" incidents.

## AFFIDAVIT OF MARION MIMS

[Counselor II]

## Defendant's Motion To Strike:

As such I noted that the program for the adolescent patients was not that well structured.
I also noted that there was a lot of chaos in the program and that there was a significant
amount of turnover in the positions of teachers. Based upon my involvement and experience
with the program, it was my judgment that this was not an exemplar education program for
the adolescent patients.

## Cited Authority:

Mims has failed to show that he has the proper foundation,
including personal knowledge, for the opinions contained in this
portion of his affidavit.    Without any factual basis for his
"involvement and experience," his "judgment" regarding the program

70

is meaningless and inadmissible.  Likewise, whether Mr. Mims felt
that the program was an "exemplar education program" is irrelevant.

**Defendant's Motion To Strike:**

> Further, the program that was being administered by Greg Hanes [sic] was not any better
> than an average educational program.

**Cited Authority:**

Whether Mims felt that the program that was being administered
by Haynes was not better than an average educational program is
irrelevant to the question at hand.  In addition, Mims has not
shown that he has the proper foundation, including personal
knowledge, for offering such an opinion.  As a result, this portion
of the affidavit is not admissible pursuant to F.R.E. 402, F.R.E.
602, and F.R.E. 701.

**Defendant's Motion To Strike:**

> During my period of employment, it was my observation that the Three Springs Courtland
> facility was a racially hostile environment for blacks.  I personally noted that there was
> predominantly more dismissals of black employees than similarly situated white employees.
> Further, I noted in my personal position that black counselors were not afforded the same
> scheduling opportunities as were white counselors.  I also noted that blacks were not given
> the same recognition for their accomplishments in work as similarly situated white employees
> were.

**Cited Authority:**

Once again, these statements are conclusory allegations
lacking in specific fact.  Mims has again failed to establish that
he has the proper foundation, including personal knowledge, for his
opinions.  See F.R.E. 602 and 701.  Specifically, Mims has failed
to provide any facts for his opinion that there was a "racially
hostile environment for blacks."  In addition, despite his

71

assertions that there were more dismissals of black employees, he has failed to provide any factual basis for the assertion. Likewise, with respect to his allegations of disparities in scheduling and recognition for accomplishments, Mims simply offers raw assertions unsupported by fact, which are inadmissible under the Federal Rules of Evidence.

### ADDITIONAL EVIDENTIARY ITEMS SUBMITTED BY PLAINTIFF IN OPPOSITION TO SUMMARY JUDGMENT

**TAB 11:    Deposition of Beverly McLemore Taken By Plaintiff On September 20, 1996.**

Court Note: This deposition is comprised of 128 pages of questions and answers and was never summarized for the Court by Plaintiff's counsel of record. However, this Court has carefully read this deposition in its entirety and has endeavored in this Memorandum Opinion to present herein all admissible relevant and material facts contained therein.

**TAB 12:    Deposition of Pam Cook Taken By Plaintiff On August 23, 1996.**

Court Note: This deposition is comprised of 250 pages of questions and answers and was never summarized for the Court by Plaintiff's counsel of record. However, this Court has carefully read this deposition in its entirety and has endeavored in this Memorandum Opinion to present herein all admissible relevant and material facts contained therein.

**TAB 13:    Defendants Answers To Plaintiff's Interrogatories.**

Court Note: Plaintiff's TAB 13 actually contains only Defendant's objections and Defendant's answers to certain Interrogatories or to parts thereof. However, Plaintiff's Written Interrogatories No. 1 through No. 11 are hereinafter set out verbatim. Moreover, Defendant's written answers to certain of Plaintiff's written Interrogatories are also hereinafter set out verbatim.

Interrogatory No. 1

State the name and current address of the person answering these interrogatories.

Answer No. 1

Vickie L. Henderson, Three Springs, Inc., 247 Chateau Drive, SW, No. A, Huntsville, AL 35801-6401.

72

## Interrogatory No. 2

State the name, business and resident address, education background and experience of each person whom you expect to call as an expert witness in the trial of this cause.

## Answer No. 2

Defendant further objects to this interrogatory to the extent that it seeks to vary the obligations imposed upon Defendant under the Federal Rules of Civil Procedure.

## Interrogatory No. 3

As to each person whom you expect to call as an expert witness at the trial of this cause, state with specificity and in detail the substance of any facts and opinions to which such person is expected to testify and a summary of the grounds for each such opinion.

## Answer No. 3

See answer to interrogatory number 2.

## Interrogatory No. 4

Identify by sex, race and age any and all persons who have held the position of "Program Director" with Defendant at any and all of its facilities since 1975.

## Objection To No. 4

Defendant and its attorneys object to Interrogatory No. 4 on the grounds that it is overly broad, oppressive, unduly burdensome and expansive and is beyond the permissible scope of discovery under the Federal Rules of Civil Procedure. Defendant and its attorneys further object on the ground that such interrogatory seeks information irrelevant to any issue in this lawsuit.

## Partial Answer To No. 4

Without waiving said objection, the following is a list by sex, race and age any and all persons who have held the position of "Program Director" with Defendant at its Courtland, Alabama facility.

|                | DOB      | Race | Sex |
|----------------|----------|------|-----|
| Allen Reynolds | 5/27/52  | W    | M   |
| Pam Cook       | 3/16/59  | W    | F   |
| Greg Haynes    | 11/1/58  | W    | M   |
| Sara Gross     | 7/25/52  | B    | F   |
| Greg Coleman   | 2/25/56  | B    | M   |
| Brenda Baird   | 10/27/55 | W    | F   |

Court Note: The Court here emphasizes that prior to the January 1993 non-selection of Plaintiff Charles L. Carter that Courtland RTC employed one Afro-American female and one Afro-American male as its Program Director.

<u>Interrogatory No. 5</u>

Identify by sex, race, age **and job position** all employees who  have worked with Three Springs Residential Treatment since 1975.

<u>Objection to No. 5</u>

Defendant further objects to this interrogatory on the grounds that it is overly broad, oppressive, unduly burdensome and expansive and is beyond the permissible scope of discovery under the Federal Rules of Civil Procedure. Defendant and its attorneys further object on the ground that such interrogatory seeks information irrelevant to any issue in this lawsuit.

<u>Interrogatory No. 6</u>

Identify the date on which the written job description for the position of "Program Director" was formally approved and implemented.

<u>Answer to No. 6</u>

The written job description for the position of "Program Director" as it existed in January 1993, was formally approved and implemented in October 1989.

<u>Interrogatory No. 7</u>

Explain why the position of "Program Director" solicited in 1993 was not generally noted to employees at Three Springs Residential Treatment.

<u>Answer No. 7</u>

In January 1993, Program Director Brenda Baird resigned her position.  In an effort to find a replacement as quickly as possible, and prior to the selection of Greg Haynes as Program Director, a review of existing staff was conducted by the Program Administrator in an effort to determine who was the most qualified staff member for the position. Familiar with the qualifications of the staff members as well as the requirements for the position of Program Director, it was determined that Greg Haynes was the most qualified candidate for the position.

<u>Interrogatory No. 8</u>

State which of the "Position Requirements" for the position of "Program Director" selected in 1993 were not met by Charles Carter.

<u>Answer No. 8</u>

<u>Mr. Carter did not possess the requisite executive/ administrative or clinical skills necessary for the position.</u>  [Emphasis by Court].

<u>Interrogatory No. 9</u>

State why Charles Carter was not interviewed for the position of "Program Director" filled in 1993.

**TAB 14:**      Three Springs Personnel/Policy Procedure Statement On Promotions [Exhibit 1 To Deposition Of Pam Cook]

Court Note: Tab 14 is set out verbatim *ante* pp. 38-39.

**TAB 15:**      **Three Springs Job Description For Program Director [Part Of Defendant's Response To Plaintiff's Request For Production].**

Court Note: This document appears verbatim *ante* p. 12.

**TAB 16:**      **Resume of Charles Carter [Part Of Defendant's Response Too Plaintiff's Request For Production].**

Court Note: This document appears as EXHIBIT #16 *ante* pp. 14-21.

**TAB 17:**      **Personnel Action Form For Brenda Baird Dated January 19, 1993. [Part Of Defendant's Response To Plaintiff's Request For Production.]**

Court Note: This document in the form and format of photocopy appears verbatim on succeeding page 77 of this Memorandum Opinion.

**TAB 18:**      **Personnel Action Form For Greg Haynes Dated January 20, 1993. [Part Of Defendant's Response To Plaintiff's Request For Production.]**

Court Note: This document in the form and format of photocopy appears verbatim on succeeding page 78 of this Memorandum Opinion.

P.A.F.
PERSONELL ACTION FORM

OATE: 1/19/93

EMPLOYEE: Brenda Boird

POSITION: Program Director

NEW HIRE:

EFFECTIVE OATE: _____ RATE OF PAY: _____

SHIFT: _____ PART-TIME: _____ FULL-TIME: _____

PRN/TEMPORARY: _____

ACTION:

TERMINATION: _____ EFFECTIVE OATE: _____

RESIGNATION: ✓ EFFECTIVE OATE: 1/19/93

RECOMMEND FOR REHIRE: _____

CHANGE IN RATE OF PAY: _____

EXTENSION OF PROBATIONARY PERIOD: _____

WRITTEN REPRIMAND: _____

CLASSIFICATION CHANGE: _____

OTHER: _____

EXPLANATION OF ACTION: Resigned due to difference in Management Style. Eligible for Vacation Leave, all benefits Severance pay through February 14 1993

SUPERVISOR X  X  X  OATE X  X

ADMINISTRATOR Pa Cook  OATE 1/19/93

## Answer No. 9

There were no in interviews conducted for the position of "Program Director" filled in 1993. In addition, please see answer number 7 above.

## Interrogatory No. 10

For the period January 1993 through February 1994, state the total compensation paid to Greg Haynes on a monthly basis for his employment with Defendant.

## Answer No. 10

| 1993 | | 1994 | |
|------|---------|------|---------|
| January | $2,875 | January | $2,875 |
| February | $2,875 | February | $2,875 |
| March | $2,875 | | |
| April | $2,875 | | |
| May | $2,875 | | |
| June | $2,875 | | |
| July | $2,875 | | |
| August | $2,875 | | |
| September | $2,875 | | |
| October | $2,875 | | |
| November | $2,875 | | |
| December | $4,573.81 | | |

## Interrogatory No. 11

For the period 1993 through February 1994, state the total compensation paid to Charles Carter on a monthly basis for his employment with Defendant.

## Answer No. 11

| 1993 | | 1994 | |
|------|-----------|------|-----------|
| January | $1,643.10 | January | $2,090.37 |
| February | $1,643.10 | February | $2,090.37 |
| March | $1,643.10 | | |
| April | $1,643.10 | | |
| May | $1,643.10 | | |
| June | $1,643.10 | | |
| July | $1,643.10 | | |
| August | $1,643.10 | | |
| September | $1,643.10 | | |
| October | $1,643.10 | | |
| November | $1,643.10 | | |
| December | $1,643.10 | | |

75

P.A.F.
PERSONELL ACTION FORM

DATE: _1/20/92_

EMPLOYEE: _Greg Hayns_

POSITION: _____

NEW HIRE:

EFFECTIVE DATE: _____  RATE OF PAY: _____

SHIFT: _____  PART-TIME: _____  FULL-TIME: _____

PRN/TEMPORARY: _____

ACTION:

TERMINATION: _____  EFFECTIVE DATE: _____

RESIGNATION: _____  EFFECTIVE DATE: _____

RECOMMEND FOR REHIRE: _____

CHANGE IN RATE OF PAY: ___✓___ From $32,200 to $34,500

EXTENSION OF PROBATIONARY PERIOD: _____

WRITTEN REPRIMAND: _____

CLASSIFICATION CHANGE: ___✓___

OTHER: _____

EXPLANATION OF ACTION: Promoted to Program Director
$34,500   Effective 1/20/95

SUPERVISOR _____  DATE _____

ADMINISTRATOR _R Cook_   DATE 1/20/93.

78

## ON THE RECORD COMPARISON OF GREGORY HAYNES
## AND PLAINTIFF CHARLES L. CARTER

1]  Haynes' educational background consists of a B.S. in Secondary Education from Livingston University in 1981 and a master's degree in Teaching from Livingston in 1991.  Exhibit B to Beverly McLemore Affidavit [Haynes' Resume]; Cook at 176:16-176:19.

2]  Before coming to Courtland, Haynes worked from 1989 to 1991 at C.I.T.Y., an alternative education program for delinquent children and teens in Tuscaloosa County.  McLemore Affidavit and Exhibit B thereto [Plaintiff's Resume and Haynes Resume]; Cook at 181:13-181:23.  Sexual offenders were included among the C.I.T.Y. students.  McLemore Affidavit.

3]  During his tenure in Tuscaloosa, Haynes served as educational coordinator of the program.  In that capacity, Haynes taught courses, monitored student behavior to attempt to ensure the students' treatment progressed as planned, and was part of a multi-disciplinary team which diagnosed each teen in the program and devised individualized treatment for them.  McLemore Affidavit; Cook Affidavit.  Haynes also prepared written and verbal reports discussing the technical aspects of this treatment.  *Id.*

4]  Plaintiff  Charles  L.  Carter  had  spent  his  entire professional career overseeing normal children in a public school setting but Haynes had far more pre-Three Springs experience dealing with the clinical treatment of troubled adolescents than Plaintiff.  McLemore Affidavit; Cook Affidavit; see infra at ¶ 16-30.

79

5]    Moreover, since Haynes joined Three Springs in August 1991 as Director of Educational Services he had supervised teachers and counselor aides, had helped with the compilation of information required **for the JCAHO review in 1992** and had assisted in the implementation of practices which conformed with those requirements. Cook at 203:24-205:10. **This experience familiarized Haynes with JCAHO's survey process and standards, as well as methods of complying with those standards.**    Cook at 87:12-88:2; 204:9-205:10.

6]    Haynes regularly prepared reports using the technical language common among professionals in the field of mental health, which were sent to psychologists, psychiatrists and government regulatory agencies. Cook at 203:18-204:8. **Finally, "in his role as a Director of Education Mr. Haynes took a very poorly performing department and turned it into a premier program. . . [s]o we had kids in a nine month period that were getting a twelve month period of academic gain."** Cook at 237:18-238:1; McLemore at 65:17-66:6.

7]    Plaintiff, however, had no experience in meeting federal or institutional standards or dealing with troubled adolescents. In fact, Plaintiff did not even know what the standards were or what purposes they served.    Plaintiff at 107:19;108:8;  117:16-117:21.    Exhibit B to Beverly McLemore Affidavit [Plaintiff's Resume]; Plaintiff at 112:2-112:18; 115:14-115:17; Cook at 101:21-102:9.

8]    In addition, as noted in Plaintiff's February 1992 performance evaluation, he had trouble using the psychological

terms and concepts required in the written reports he submitted as a Counselor and had difficulties assessing residents' behavior and dealing with them effectively when that behavior was inappropriate. Cook at 200:13-200:22; **McLemore** at 45:5-46:12; 120:5-120:18; Defendant's Exhibit 5 to Plaintiff's Deposition [February 1992 performance review]; **see also** Plaintiff at 77:9-79:14.

9] Plaintiff also fell short of Haynes in verbal skills, ability to evaluate and use data from statistical reports and budgets, initiative and judgment in organizing and planning activities, and winning confidence and support from the staff. Cook at 198:1-198:16; 211:23-214:16; 224:10-226:4; 236:13-240:6; McLemore at 120:5-120:18. Plaintiff's lack of relevant substantive experience resulted in part from the fact that, aside from his pursuit of the Program Director job, Plaintiff never sought a promotion to a supervisory position at Courtland. Plaintiff at 211:22-213:9 (**"Well, I wouldn't mind being over the whole thing, but I didn't want to be just a teacher. I wanted to be director of [the facility]."** [emphasis added].

## [PLAINTIFF'S PRESENT WORK STATUS]

Plaintiff continued to work at Courtland RTC until September 1993 at which point he took an almost two month paid leave of absence as a result of back pain. Plaintiff at 237:12-238:9.

Plaintiff returned to work at Courtland RTC in late November 1993 **but left Three Springs permanently in February 1994.** Plaintiff at 239:2-239:8. **Since that date, Plaintiff's back pain**

81

has left him unable to work, and he is currently collecting
disability payments from the Social Security Administration.
Plaintiff at 239:9-239:14.


## DISCUSSION OF APPLICABLE SUMMARY JUDGMENT LAW

Rule 56(b), Fed.R.Civ.P., provides:

**(b) For Defending Party. A party against whom a claim,
counterclaim, or cross-claim is asserted or a declaratory
judgment is sought may, at any time, move with or without
supporting affidavits for a summary judgment in the
party's favor as to all or any part thereof.**

Rule 56(c), Fed.R.Civ.P., provides in pertinent part as

follows:

**(c) Motion and Proceedings Thereon. The motion shall be
served at least 10 days before the time fixed for the
hearing. The adverse party prior to the day of hearing
may serve opposing affidavits. The judgment sought shall
be rendered forthwith if the pleadings, depositions,
answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of
law.**

Rule 56(e), Fed.R.Civ.P., provides:

**(e)    Form of Affidavits; Further Testimony; Defense
Required. Supporting and opposing affidavits shall be
made on personal knowledge, shall set forth such facts as
would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify to
the matters stated therein. Sworn or certified copies of
all papers or parts thereof referred to in an affidavit
shall be attached thereto or served therewith. The court
may permit affidavits to be supplemented or opposed by
depositions, answers to interrogatories, or further
affidavits. When a motion for summary judgment is made
and supported as provided in this rule, an adverse party
may not rest upon the mere allegations or denials of the
adverse party's pleading, but the adverse party's
response, by affidavits or as otherwise provided in this
rule, must set forth specific facts showing that there is**

82

a genuine issue for trial.  If the adverse party does not
so respond, summary judgment, if appropriate, shall be
entered against the adverse party.

Court Note: This first sentence of Rule 56(e) completely derails the precisely designated portions of the ten
Affidavits of the five black females and five black males offered by Plaintiff in opposition to summary
judgment to which Defendant directed its Motion To Strike which this Court has granted in its entirety.

In 1986, the Supreme Court revisited summary judgment law in
a trio of cases.  *Celotex Corp. v. Cattrett*, 477 U.S. 317 (1986);
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and
*Matsushita Electric Industrial Corp. v. Zenith Radio Corp.* 475 U.S.
574 (1986).

In *Celotex Corp v. Catrett*, the Court held that a party moving for summary
judgment and not bearing the burden of proof at trial need not negate the other party's case.
Rather, the moving party could discharge its burden by demonstrating the absence of an
essential element of the case of the opponent, who bears the burden of proof at trial. That
demonstration could be made without submission of affidavits, by reliance on the pleadings,
depositions, answers to interrogatories, and admissions on file.

In *Anderson v. Liberty Lobby*, the Court held that (1) only disputes over facts that
might legitimately affect the outcome are material under Rule 56; (2) the test for determining
whether a genuine issue of material fact exists is the same as the test for granting a directed
verdict (i.e., whether the evidence is sufficient to sustain a verdict for the nonmoving party);
and (3) in applying that test, the court must view the evidence in the light most favorable to
the nonmovant and assess its sufficiency according to the evidentiary burden imposed by the
controlling substantive law.

Finally, in *Matsushita Electric Industrial Co. v. Zenith Radio Corp*, the court affirmed
a summary judgment for defendants in an antitrust case involving an alleged conspiracy to
fix unreasonably low prices. The Court held that, as a matter of substantive antitrust law,
a case may not go to a jury if plaintiffs produce no direct evidence of a conspiracy, and an
inference of lawful conduct from the circumstantial evidence is at least as plausible as an
inference of a conspiracy.

Prior to its rendition of *Celotex*, *Anderson v. Liberty Lobby*
and *Matsushita* in 1986 the Supreme Court in *Adickes v. S.H. Kress
& Co.*, 398 U.S. 144 (1970), discussed the proper allocation of the
parties' burdens on a motion for summary judgment under Fed.R.Civ.P.
56.  Because of the importance of "the *Adickes* rule" which the
Eleventh Circuit Court of Appeals emphasized so strongly in its

83

1991 case of *Clark, et als. v. Coats & Clark*, 929 F.2d 604 (11th Cir. 1991), hereinafter presented, this United States District Court next proceeds with an explanation of the facts and ultimate holding in *Adickes*.

In *Adickes* a white school teacher had gone to a lunch counter in a Kress store with six of her black students and was refused service.  Upon leaving the store, she was arrested for vagrancy. She brought a civil rights suit under 42 U.S.C. § 1983 alleging, among other things, that the police and store owner had conspired to violate her civil rights.   The defendant moved for summary judgment on the basis of affidavits and depositions denying the conspiracy.  While offering no direct evidence of a conspiracy, the plaintiff noted that the defendant had failed to refute the allegation in her pleading that a police officer was present in the store at the time of the incident, and argued that a jury could infer a conspiracy from the officer's presence.  The district court nevertheless granted summary judgment on the ground that the plaintiff had failed to allege facts from which a conspiracy might be inferred.

The Supreme Court in *Adickes* reversed on the ground that the defendant had "failed to carry its burden of showing the absence of any genuine issue of fact.[14]   The defendant had not carried its burden "because of its failure to foreclose the possibility that there was a policeman in the Kress store while [plaintiff] was

---

[14]  *Id.* at 153.

awaiting service, and that this policeman reached an understanding with some Kress employee that [plaintiff] not be served."[15]   Most courts and commentators read this decision as requiring the movant to disprove the plaintiff's claim in order to obtain summary judgment.[16]   Thus, regardless of which party would have the burden of proof at trial, Rule 56 was interpreted as requiring the movant to carry the burden of proving its case or disproving the opposition's case.

> **[Eleventh Circuit Court Of Appeals Construction Of *Celotex In Clark, et als. v. Coats & Clark, Inc.*, 929 F.2d 604, 607 (1991, 11th Cir.]**

On April 19, 1991, the Eleventh Circuit Court of Appeals in *Clark, et als. v. Coats & Clark, supra*, held that the Supreme Court in *Celotex* <u>established an exception to the *Adickes* rule for the uncommon situation shown in the *Celotex* summary judgment record</u>. Then the *Coats & Clark* wrote [beginning at p. 604]:

"We must emphatically state, however, that the Court did not overrule *Adickes*.   Rather, the Court reiterated that "[o]f course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate

---

[15] *Id.* at 157.

[16] *See, e.g., Catrett v. Celotex Corp.*, 756 F.2d 181, 184 (D.C.Cir. 1985), *rev'd*, 477 U.S. 317 (1986).

the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). No Justice in either the majority or the dissent in *Celotex* ever questioned that the *Adickes* rule remained the generally applicable rule. [n.7] In fact, most of the discussion in both the majority and dissenting opinions concerned what constitutes a "showing" of the absence of a genuine issue of material fact sufficient to meet the movant's burden under Rule 56. See *Celotex*, 477 U.S. at 323-25, 106 S.Ct. at 2553-54, *id.* at 331-33, 106 S.Ct. at 2557-58 (Brennan, J., dissenting); see also *id.* at 328-29, 106 S.Ct. at 2555 (White, Jr., concurring in opinion and judgment of Court)."

To summarize, the *Adickes* rule remains the general rule. The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it

---

[7] It is instructive to note that the dissent fully agreed with the majority that the *Adickes* rule remained the general rule, ("The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment"), *Celotex*, 477 U.S. at 331, 106 S.Ct. at 2557 (Brennan, J., dissenting), but believed *Celotex* had not met its burden and that therefore summary judgment was inappropriate. *Id.* at 329 & 337, 106 S.Ct. at 2556 & 2560.

is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. **Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial.**

The two scope notes in the reported opinion of *Coats & Clark*, 929 F.2d 604 (11th Cir. 1991), which fairly summarize the summary judgment propositions of law enunciated by the Eleventh Circuit in its *Coats & Clark* opinion are as follows:

## SCOPE NOTE 1 Key No. 2544

**Moving party bears initial burden to show, by reference to materials on file, that there are no genuine issues of material fact that could be decided at trial; only after moving party meets that burden does burden shift to nonmoving party to show that there is indeed material issue of fact that precludes summary judgment. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.**

## SCOPE NOTE 2 Key No. 2544

**Under certain circumstances, movant may meet its burden of showing absence of genuine issues of material fact without negating element of material fact without negating element of nonmoving party's claim and, under those circumstances, it is sufficient to show that materials on file demonstrate that party bearing burden of proof at trial will not be able to meet that burden; it is never enough simply to state that nonmoving party cannot meet burden at trial. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.**

87

### DISTRICT COURT DISCUSSION OF APPLICATION IN PRESENT CASE OF *CELOTEX* AND *ADICKES*, AS INTERPRETED BY ELEVENTH CIRCUIT COURT OF APPEALS IN *COATS & CLARK*.

The Eleventh Circuit's decision in *Coats & Clark* stands for two propositions. First, the case's literal holding establishes that, even after *Celotex*, the summary judgment moving party [in this instance Defendant Three Springs Residential Treatment Center] bears the *initial burden* of affirmatively showing that no genuine issues of material fact remain before the burden shifts to the non-moving party [in this instance Plaintiff Charles L. Carter].[17] Second, the decision also reveals the underlying doctrinal view of the Eleventh Circuit that summary judgment should be cautiously invoked.[18]  With respect to both propositions the district courts of the Eleventh circuit are now mandated to hold that the Eleventh Circuit Court of Appeals in *Coats & Clark* has correctly interpreted the law and the purpose behind Rule 56, Fed.R.Civ.P., summary judgment.

In the first paragraph of its discussion in *Coats & Clark*, the Eleventh Circuit stated its intention to "set out the basic contours of summary judgment law."[19]  The *Coats & Clark* court sought to explain the burdens involved in a motion for summary judgment because it obviously believed that the district court's[20]

---

[17] *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

[18] Id.

[19] Id. at 606.

[20] In the case below.

misplacement of the burden was not uncommon in the circuit.[21]
Positioned as it is and being keenly aware of its duty and
responsibility to follow Eleventh Circuit Court of Appeals
decisions which must be acknowledged and treated by it as binding
precedent [except in most extraordinary circumstances which are not
present in the instant case], this district court acknowledges that
in *Coats & Clark* the Eleventh Circuit Court of Appeals correctly
vacated the decision [of the district court below] to grant summary
judgment.  Furthermore, this district court recognizes that in the
present case the moving party bears the initial burden to show that
no genuine issue fact remains in this summary judgment record, a
rule left unchanged by *Celotex*.[22]

As *Coats & Clark* recognized in that reported opinion, it is
summary judgment law in this Circuit that simply filing a motion
for summary judgment does not immediately compel the opposing party
to come forward with evidence demonstrating material issues of fact
as to every element of the opposing party's case.  *Celotex* according
to *Coats & Clark*, merely provides another way to meet the initial
summary judgment burden in cases where the non-moving party has the
burden of proof at trial.[23]

---

[21]  Id. at 608.

[22]  See *Russ v. Int'l. Paper Co.* 943 F.2d 589, 591 (5th Cir. 1991) (citing Eleventh Circuit's
"thorough opinion" in *Clark* as authority that amply demonstrates this common misunderstanding of *Celotex*;
see also *Higgins v. Scherr*, 837 F.2d 155, 156-57 (4th Cir. 1988) (stating that district court had given *Celotex*
more weight then necessary and non-movant was not required to prove entire case upon movant's mere
incantations of "summary judgment" as to one aspect.

[23]  *Clark*, 929 F.2d at 608.

In *Coats & Clark* the Eleventh Circuit recognized that the Supreme Court's holding in *Celotex* does not reduce or shift the moving party's initial burden in a motion for summary judgment.[24]

### [SUMMARY]

Thus, in the Eleventh Circuit and in the other circuits which have cited *Coats & Clark* with approval or have made identical rulings of record, the *Adickes* rule remains the general rule, *i.e.*, the moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has not been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change that general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. Even after *Celotex* it is never enough simply to state in support of Rule 56 summary judgment that the non-moving party cannot meets its burden at trial.[25]

---

[24]  Id. at 608.

[25]  This United States District Court acknowledges its careful study and review of the excellent case note entitled "*Clark v. Coats & Clark, Inc.*: The Eleventh Circuit Clarifies The Initial Burden In A

90

## DISCUSSION OF ISSUES PRESENTED IN PRESENT
## CASE BY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Because Plaintiff Charles L. Carter quite obviously has no direct evidence to support his claim that the Defendant Three Springs Residential Treatment Center intentionally failed to promote him in January 1993 from his non-clinical, low tier position of shift supervisor at Courtland RTC to the "next to the top" executive position of Program Director at Courtland RTC because of his Afro-American race, he is forced to seek to establish a prima facie case of discriminatory failure to promote relying on circumstantial evidence. To meet that burden, Plaintiff must show [1] that he is a member of a protected class; [2] that he was qualified for the position of Program Director at Courtland RTC when that position became vacant in January 1993; [3] that he was rejected by Defendant despite his qualifications for the position; and [4] that the Defendant filled that executive position at Courtland RTC with an equally or less qualified person outside the protected class. Since this summary judgment evidentiary record taken in its entirety [less stricken, designated portions of Plaintiff's ten Affidavits from the five black females and five black males] submitted by Plaintiff in opposition to summary judgment clearly establishes that Plaintiff **was not** qualified for the Program Director position at Courtland RTC and that Gregory Haynes, a white male, was not only well qualified for this position

---

Motion For Summary Judgment" by James V. Chin published in the Georgia Law Review, Vol 26, pp. 1009-1023.

of Program Director and thus was far, far better qualified for such position than was Plaintiff,[26] Plaintiff cannot make and has not made in this summary judgment proceeding even a prima facie case of intentional racial discrimination. Moreover, in the considered opinion and judgment of this United States District Court this Plaintiff would have abjectly failed to establish that he was qualified for the executive position of Program Director at Courtland RTC in January 1993 even if this Court had overruled in entirety Defendant's Motion To Strike precisely designated portions of the ten Summary Judgment Affidavits from the five black females and five black males which Plaintiff submitted in opposition to summary judgment.

In conformity with the rule of *Celotex, Adickes* and *Clark v. Coates & Clark, Inc.*, *ante* pp. 80-87, inclusive, and with Rules 56(b), (c) and (e) *ante* p. 79, this United States District Court after a careful and thorough review and consideration of all of the materials on file in this case submitted by the Summary Judgment Movant/Defendant Three Springs Residential Treatment Center [which **is not** the party which bears the burden of proof at trial of this civil action], in support of its MOTION FOR SUMMARY JUDGMENT in this civil action, including: [A] Plaintiff's Deposition Parts One and Two and selected Defendant's exhibits thereto; [B] Beverly McLemore's Deposition; [C] Dr. Pamelea Cook's Deposition; [D]

---

[26] Plaintiff obviously and clearly was not remotely qualified for this position because of his complete lack of the requisite clinical training, experience and skills in the field of treatment of adolescent sexual dysfunctions and other sexual disorders.

92

Beverly McLemore's Affidavit and exhibits thereto; [E] Dr. Pamelea Cook's Affidavit; [F] *Carter v. Muscle Shoals City Board of Education*, No. 81-7247 (11th Cir. 1982) (unpublished opinion); [1] Beverly McLemore's Second Affidavit and exhibits thereto; [2] Defendant's Exhibit No. 12 to Plaintiff's Deposition [August 2, 1992 Wage and Hour Survey completed by Plaintiff; [3] Defendant's Exhibit No. 16 to Defendant's Deposition [Plaintiff's September 1992 EEOC charge]; [4] Defendant's Exhibit No. 21 to Plaintiff's Deposition [August 18, 1993 Plaintiff letter to counsel J. Benn with attached July 19, 1993 Cook letter to Plaintiff]; [5] Defendant's Exhibit No. 22 to Plaintiff's Deposition [November 30, 1993 J. Benn letter to EEOC]; and [6] Defendant's Exhibit No. 24 to Plaintiff's Deposition [June 28, 1993 Plaintiff letter to B. McLemore], **and given the fact** that this federal district court upon consideration of the facts and applicable law has by ORDER duly entered in the above entitled civil action this date contemporaneously with the entry of record of this MEMORANDUM OPINION GRANTED Defendant's January 8, 1997 MOTION TO STRIKE certain precisely designated portions of the SUMMARY JUDGMENT AFFIDAVITS of Tyrone Bowling, Gregory Jones, Rudolph Nails, Margarett Allen, Samuel Brewer, Arlene Hall, Tina Carter, Ronnie Johnson, Annie Cobb and Marion Mims submitted by Plaintiff Charles L. Carter in the above-entitled civil action on January 3, 1997 in opposition to Defendant's Motion For Summary Judgment herein **in its entirety** and has in such ORDER also duly STRICKEN each precisely designated portion of each designated Summary Judgment Affidavit submitted by Plaintiff which Defendant

93

formally sought to strike by its January 8, 1997 MOTION TO STRIKE filed by Defendant in the above-entitled civil action, **and** after a careful and thorough review and consideration [1] of all the **non-stricken materials** on file in this case submitted by the NON-MOVING SUMMARY JUDGMENT PARTY Plaintiff Charles L. Carter in opposition to Defendant's Motion For Summary Judgment herein; and [2] applicable law this Court expressly finds, expressly determines and now expressly holds: [1] that the SUMMARY JUDGMENT MOVING PARTY, Defendant Three Springs Residential Treatment Center, by its evidentiary submissions in support of summary judgment and supporting briefs and arguments has fully and completely successfully borne its **initial burden** in this Rule 56, Fed.R.Civ.P., summary judgment proceeding of showing that no genuine issues of material fact remain that should be decided at a trial of the above-entitled civil action; [2] **that the burden now shifts to the non-moving party, Plaintiff Charles L. Carter, to demonstrate that there is indeed a material issue of fact in this case which precludes summary judgment**; and [3] the non-moving party, Plaintiff Charles L. Carter, has wholly [and clearly and abjectly] failed to demonstrate by his evidentiary submissions in this case in opposition to summary judgment and briefs and arguments in purported support of Plaintiff's position [he simply could not overcome Courtland RTC's legitimate business justification]; and [4] that Defendant's Motion For Summary Judgment in this case is due to be forthwith fully granted by Summary Judgment Order duly entered of record herein contemporaneously with

94

the entry of record of this MEMORANDUM OPINION and that the above-
entitled civil action is thereupon due to be DISMISSED with
prejudice by the Court in favor of Defendant Three Springs
Residential Treatment Center and against Plaintiff Charles L.
Carter by entry of Rule 58, Fed.R.Civ.P. FINAL JUDGMENT in favor of
Defendant and against Plaintiff with costs taxed against Plaintiff
Charles L. Carter.  *Wu v. Thomas*, 847 F.2d 1480 (11th Cir. 1988)
["Appellant clearly failed to show that she was qualified for
promotion to professor."]; *Hill v. Seaboard C.L.R. Co.*, 885 F.2d
804 (11th Cir. 1989) ["The district court implicitly found that the
four white employees promoted over Coleman were more qualified;
although Coleman might prevail in establishing a prima facie case,
he could not overcome a legitimate business justification."]

Appropriate orders will be contemporaneously entered in the
above-entitled civil action in conformity with this Memorandum
Opinion.

DONE this 12th day of February, 1997.

E.B. HALTOM, JR.
SENIOR UNITED STATES DISTRICT JUDGE

FLORENCE, ALABAMA ADDRESS:
U.S. District Court
Northern District of Alabama
U.S. Post Office & Courthouse
210 North Seminary Street
P.O. Box 1076
Florence, AL 35630
Telephone: (205) 760-8415